In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 02-1916

LEARNING CURVE TOYS,
INCORPORATED,

*Plaintiff-Counter-Defendant-Appellee,*

*v.*

PLAYWOOD TOYS, INCORPORATED,

*Defendant-Counter-Plaintiff-Appellant,*

*v.*

ROY WILSON, HARRY ABRAHAM,
and JOHN LEE,

*Counter-Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 6884—**Rebecca R. Pallmeyer**, *Judge.*

---

ARGUED DECEMBER 13, 2002—DECIDED AUGUST 18, 2003

---

Before RIPPLE, KANNE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* PlayWood Toys, Inc. ("PlayWood")
obtained a jury verdict against Learning Curve Toys,
Inc. and its representatives, Roy Wilson, Harry Abraham
and John Lee (collectively, "Learning Curve"), for misap-

propriation of a trade secret in a realistic looking and sounding toy railroad track under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* The jury awarded PlayWood a royalty of "8% for a license that would have been negotiated [absent the misappropriation] to last for the lifetime of the product." R.194. Although there was substantial evidence of misappropriation before the jury, the district court did not enter judgment on the jury's verdict. Instead, it granted judgment as a matter of law in favor of Learning Curve, holding that PlayWood did not have a protectable trade secret in the toy railroad track. PlayWood appealed. For the reasons set forth in the following opinion, we reverse the judgment of the district court and reinstate the jury's verdict. We further remand the case to the district court for a jury trial on exemplary damages and for consideration of PlayWood's request for attorneys' fees.

# I

## BACKGROUND

### A. Facts

In 1992, Robert Clausi and his brother-in-law, Scott Moore, began creating prototypes of wooden toys under the name PlayWood Toys, Inc., a Canadian corporation. Clausi was the sole toy designer and Moore was the sole officer and director of PlayWood. Neither Clausi nor Moore had prior experience in the toy industry, but Clausi had "always been a bit of a doodler and designer," Trial Tr. at 58, and the two men desired to "create high-quality hardwood maple toys for the independent toy market," *id.* at 241. As a newly formed corporation, PlayWood did not own a facility in which it could produce toys. Instead, it worked in conjunction with Mario Borsato, who owned a wood-

working facility. Subject to a written confidentiality agreement with PlayWood, Borsato manufactured prototypes for PlayWood based on Clausi's design specifications.

PlayWood's first attempt to market publicly its toys was at the Toronto Toy Fair on January 31, 1992. PlayWood received favorable reviews from many of the toy retailers in attendance; PlayWood also learned that the best way to get recognition for its toys was to attend the New York Toy Fair ("Toy Fair") the following month. Based on this information, Clausi and Moore secured a position at the Toy Fair in order to display PlayWood's prototypes. It was during this Toy Fair that Clausi and Moore first encountered Learning Curve representatives Roy Wilson, Harry Abraham and John Lee.

On the morning of February 12, 1993, the first day of the Toy Fair, Roy Wilson stopped at PlayWood's booth and engaged Clausi and Moore in conversation. Wilson identified himself as Learning Curve's toy designer and explained that his company had a license from the Britt Allcroft Company to develop Thomas the Tank Engine & Friends™ (hereinafter "Thomas") trains and accessories. Wilson commented that he was impressed with the look and quality of PlayWood's prototypes and raised the possibility of working together under a custom manufacturing contract to produce Learning Curve's line of Thomas products. Clausi and Moore responded that such an arrangement would be of great interest to PlayWood. Later that same day, Harry Abraham, Learning Curve's vice president, and John Lee, Learning Curve's president, also stopped by PlayWood's booth. They too commented on the quality of PlayWood's prototypes and indicated that PlayWood might be a good candidate for a manufacturing contract with Learning Curve.

Clausi and Moore continued to have discussions with Learning Curve's representatives over the remaining days

of the Toy Fair, which ended on February 14. During these discussions, Lee indicated that he would like two of his people, Abraham and Wilson, to visit PlayWood in Toronto the day after the Toy Fair ended in order to determine whether the two parties could work out a manufacturing arrangement for some or all of Learning Curve's wooden toys. Clausi, feeling a little overwhelmed by the suggestion, requested that their visit be postponed a few days so that he could better acquaint himself with Learning Curve's products. The parties ultimately agreed that Abraham and Wilson would visit PlayWood at Borsato's facility on February 18, 1993, four days after the conclusion of the Toy Fair. Clausi spent the next several days after the Toy Fair researching Learning Curve's products and considering how PlayWood could produce Learning Curve's trains and track.

On February 18, 1993, Abraham and Wilson visited PlayWood in Toronto as planned. The meeting began with a tour of Borsato's woodworking facility, where the prototypes on display at the Toy Fair had been made. After the tour, the parties went to the conference room at Borsato's facility. At this point, according to Clausi and Moore, the parties agreed to make their ensuing discussion confidential. Clausi testified:

> After we sat down in the board room, Harry [Abraham of Learning Curve] immediately said: "Look, we're going to disclose confidential information to you guys, and we're going to disclose some designs that Roy [Wilson of Learning Curve] has that are pretty confidential. If Brio were to get their hands on them, then we wouldn't like that. And we're going to do it under the basis of a confidential understanding."

> And I said: "I also have some things, some ideas on how to produce the track and produce the trains now

that I've had a chance to look at them for the last couple of days, and I think they're confidential as well. So if we're both okay with that, we should continue." So we did.

Trial Tr. at 76-77. Moore testified to the existence of a similar conversation:

It was at this point that Harry Abraham told us that they were going to disclose some confidential documents, drawings, pricing, margins, and asked us if we would keep that information confidential.

\* \* \* \*

I believe it was Robert [Clausi] who said that, you know, absolutely, we would keep it confidential. In fact, we had some ideas that we felt would be confidential we would be disclosing to them, and would they keep it, you know, confidential? Would they reciprocate? And Harry [Abraham] said: "Absolutely." And then we proceeded to go along with the meeting.

Trial Tr. at 247-48.

Immediately after the parties agreed to keep their discussion confidential, Wilson, at Abraham's direction, showed Clausi and Moore drawings of various Thomas characters and provided information on the projected volume of each of the products. Clausi testified that he considered the documents disclosed by Learning Curve during the meeting confidential because they included information on products not yet released to the public, as well as Learning Curve's projected volumes, costs and profit margins for various products. After viewing Wilson's various drawings, the parties discussed PlayWood's ideas on how to manufacture Learning Curve's trains. Clausi suggested that they might use a CNC machine, which he defined as a com-

puter numerically controlled drill that carves in three dimensions, to create Learning Curve's trains out of a single piece of wood (as opposed to piecing together separate pieces of wood).

The parties' discussion eventually moved away from train production and focused on track design. Wilson showed Clausi and Moore drawings of Learning Curve's track and provided samples of their current product. At this point, Abraham confided to Clausi and Moore that track had posed "a bit of a problem for Learning Curve." Trial Tr. at 85. Abraham explained that sales were terrific for Learning Curve's Thomas trains, but that sales were abysmal for its track. Abraham attributed the lack of sales to the fact that Learning Curve's track was virtually identical to that of its competitor, Brio, which had the lion's share of the track market. Because there was "no differentiation" between the two brands of track, Learning Curve's track was not even displayed in many of the toy stores that carried Learning Curve's products. *Id.* Learning Curve had worked unsuccessfully for several months attempting to differentiate its track from that of Brio.

After detailing the problems with Learning Curve's existing track, Abraham inquired of Clausi whether "there was a way to differentiate" its track from Brio's track. Trial Tr. at 86. Clausi immediately responded that he "had had a chance to look at the track and get a feel for it [over] the last few days" and that his "thoughts were that if the track were more realistic and more functional, that kids would enjoy playing with it more and it would give the retailer a reason to carry the product, especially if it looked different than the Brio track." *Id.* at 87. Clausi further explained that, if the track "made noise and [] looked like real train tracks, that the stores wouldn't have any problem, and the Thomas the Tank line, product line would have [] its own

different track" and could "effectively compete with Brio." *Id.* Abraham and Wilson indicated that they were "intrigued" by Clausi's idea and asked him what he meant by "making noise." *Id.*

Clausi decided to show Abraham and Wilson exactly what he meant. Clausi took a piece of Learning Curve's existing track from the table, drew some lines across the track (about every three-quarters of an inch), and stated: "We can go ahead and machine grooves right across the upper section . . . , which would look like railway tracks, and down below machine little indentations as well so that it would look more like or sound more like real track. You would roll along and bumpity-bumpity as you go along." Trial Tr. at 255. Clausi then called Borsato into the conference room and asked him to cut grooves into the wood "about a quarter of an inch deep from the top surface." *Id.* at 88. Borsato left the room, complied with Clausi's request, and returned with the cut track three or four minutes later. Clausi ran a train back and forth over the cut piece of track. The track looked more realistic than before, but it did not make noise because the grooves were not deep enough. Accordingly, Clausi instructed Borsato to cut the grooves "just a little bit deeper so that they go through the rails." *Id.* Borsato complied with Clausi's request once again and returned a few minutes later with the cut piece of track. Clausi proceeded to run a train back and forth over the track. This time the track made a "clickety-clack" sound, but the train did not run smoothly over the track because the grooves were cut "a little bit too deep." *Id.* at 258. Based on the sound produced by the track, Clausi told Abraham and Moore that if PlayWood procured a contract with Learning Curve to produce the track, they could call it "Clickety-Clack Track." *Id.* at 89.

Both Abraham and Wilson indicated that Clausi's concept of cutting grooves into the track to produce a clacking

sound was a novel concept. Thereafter, Wilson and Clausi began to discuss how they could improve the idea to make the train run more smoothly on the track, but Abraham interrupted them and stated: "No, focus. You guys have to get the contract for the basic product first, and then we can talk about new products, because . . . it takes [our licensor] a long time to approve new products and new designs." Trial Tr. at 89.

The meeting ended shortly thereafter without further discussion about Clausi's concept for the noise-producing track. Before he left, Wilson asked Clausi if he could take the piece of track that Borsato had cut with him while the parties continued their discussions. Clausi gave Wilson the piece of track without hesitation. The piece of track was the only item that Abraham and Wilson took from the meeting. Clausi and Moore did not ask Wilson for a receipt for the cut track, nor did they seek a written confidentiality agreement to protect PlayWood's alleged trade secret. After the meeting, Clausi amended PlayWood's confidentiality agreement with Borsato to ensure that materials discussed during the meeting would remain confidential. Clausi also stamped many of the documents that he received from Learning Curve during the meeting as confidential because they included information on products not yet released to the public. PlayWood never disclosed the contents of Learning Curve's documents to anyone.

During March of 1993, PlayWood and Learning Curve met on three separate occasions to discuss further the possibility of PlayWood manufacturing Learning Curve's Thomas products. At one of the meetings, and at Learning Curve's request, PlayWood submitted a manufacturing proposal for the Thomas products. Learning Curve rejected PlayWood's proposal. Learning Curve told Clausi that its

licensor wanted the Thomas products to be made in the United States.

Thereafter, PlayWood had no contact with Learning Curve until late October of 1993, when Abraham contacted Clausi to discuss another possible manufacturing contract because Learning Curve's secondary supplier was not providing enough product. Again, PlayWood submitted a manufacturing proposal at Learning Curve's request, but it too was rejected. Learning Curve later stated that its new business partner had decided to manufacture the product in China.

Clausi and Moore continued to work on PlayWood's toy concepts. After the 1994 New York Toy Fair, which was not particularly successful for PlayWood, Clausi and Moore began to focus their efforts on refining PlayWood's concept for the noise-producing track. During this time, Clausi and Moore made no attempt to license or sell the concept to other toy companies because they believed that PlayWood still had "an opportunity to get in the door" with Learning Curve if they could perfect the concept and also because they believed that they were bound by a confidentiality agreement. Trial Tr. at 267.

In December of 1994, while shopping for additional track with which to experiment, Moore discovered that Learning Curve was selling noise-producing track under the name "Clickety-Clack Track." Like the piece of track that Clausi had Borsato cut during PlayWood's February 18, 1993, meeting with Learning Curve, Clickety-Clack Track™ has parallel grooves cut into the wood, which cause a "clacking" sound as train wheels roll over the grooves. Learning Curve was promoting the new track as

> the first significant innovation in track design since the inception of wooden train systems. . . . It is quite

> simply the newest and most exciting development to come along recently in the wooden train industry, and it's sure to cause a sensation in the marketplace. . . . [I]t brings that sound and feel of the real thing to a child's world of make-believe without bells, whistles, electronic sound chips or moving parts.

PlayWood's Tr. Ex.71.

Moore was "stunned" when he saw the track because he believed that Learning Curve had stolen PlayWood's concept. Trial Tr. at 268. He testified: "This was our idea. This is what we've been working on even up to that day to go back to [Learning Curve] as an opportunity to get in the door, and there it is on the shelf." *Id.* Moore purchased a package of Clickety-Clack Track™ and showed it to Clausi. Clausi testified that he was disappointed when he saw the track because he believed that Learning Curve had taken PlayWood's name and design concept "almost exactly as per [their] conversation" on February 18, 1993. Trial Tr. at 103.

PlayWood promptly wrote a cease and desist letter to Learning Curve. The letter accused Learning Curve of stealing PlayWood's concept for the noise-producing track that it disclosed to Learning Curve "in confidence in the context of a manufacturing proposal." PlayWood's Tr. Ex.66 at 1. Learning Curve responded by seeking a declaratory judgment that it owned the concept.

Previously, on March 16, 1994, Learning Curve had applied for a patent on the noise-producing track. The patent, which was obtained on October 3, 1995, claims the addition of parallel impressions or grooves in the rails, which cause a "clacking" sound to be emitted as train wheels roll over them. The patent identifies Roy Wilson of Learning Curve as the inventor.

Clickety-Clack Track™ provided an enormous boost to Learning Curve's sales. Learning Curve had $20 million in track sales by the first quarter of 2000, and $40 million for combined track and accessory sales.

## B. District Court Proceedings

Learning Curve responded to PlayWood's cease and desist letter by seeking a declaratory judgment that it owned the concept for noise-producing toy railroad track, as embodied in Clickety-Clack Track.™ PlayWood counterclaimed against Learning Curve, as well as its representatives, Roy Wilson, Harry Abraham and John Lee. PlayWood asserted that it owned the concept and that Learning Curve had misappropriated its trade secret.[1] Learning Curve voluntarily dismissed its complaint for declaratory relief, and PlayWood's claim for trade secret misappropriation proceeded to trial. The jury returned a verdict in favor of PlayWood. The trial court declined to enter judgment on the verdict and instead asked the par-

---

[1] In its amended counterclaim, PlayWood asserted eight causes of action: (1) implied-in-fact contract; (2) quasi-contract; (3) idea misappropriation; (4) fraud and deceptive business practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*; (5) misappropriation of trade secrets under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*; (6) unfair competition under § 44(b) of the Lanham Act, 15 U.S.C. § 1126; (7) unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125; and (8) deceptive trade practices under the Uniform Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.* R.35. With the exception of misappropriation of trade secrets, the district court entered summary judgment against PlayWood on all counts. PlayWood does not appeal the grant of summary judgment on those counts.

ties to brief Learning Curve's Rule 50 motion on the issue of whether PlayWood had a protectable trade secret under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* The district court granted Learning Curve's motion and entered judgment in its favor on the ground that PlayWood presented insufficient evidence of a trade secret. *See* R.202. Specifically, the court determined that PlayWood did not have a trade secret in its concept for noise-producing toy railroad track under Illinois law because: (1) PlayWood did not demonstrate that its concept was unknown in the industry; (2) PlayWood's concept could have been easily acquired or duplicated through proper means; (3) PlayWood failed to guard the secrecy of its concept; (4) PlayWood's concept had no economic value; and (5) PlayWood expended no time, effort or money to develop the concept. *See id.*

## II

## DISCUSSION

### A. Trade Secret Status

We review the district court's decision to grant Learning Curve's motion for judgment as a matter of law de novo, viewing the evidence in the light most favorable to Play-Wood. *See Veach v. Sheeks*, 316 F.3d 690, 692 (7th Cir. 2003). "We shall not second-guess the jury's view of the contested evidence; the proper inquiry is whether, given the totality of the evidence, [PlayWood] presented sufficient evidence from which a reasonable jury could find in [its] favor." *David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003).

The parties agree that their dispute is governed by the Illinois Trade Secrets Act ("Act"), 765 ILCS 1065/1 *et seq.* To

prevail on a claim for misappropriation of a trade secret under the Act, the plaintiff must demonstrate that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992) (per curiam); *Southwest Whey, Inc. v. Nutrition 101, Inc.*, 117 F. Supp. 2d 770, 775-76 (N.D. Ill. 2000); *Magellan Int'l. Corp. v. Salzgitter Handel GmbH.*, 76 F. Supp. 2d 919, 926 (N.D. Ill. 1999). The issue currently before us is whether there was legally sufficient evidence for the jury to find that PlayWood had a trade secret in its concept for the noise-producing toy railroad track that it revealed to Learning Curve on February 18, 1993.

The Act defines a trade secret as:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
>> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>>
>> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). Both of the Act's statutory requirements focus fundamentally on the secrecy of the information sought to be protected. *See Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 942 (7th Cir. 1996); *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1072 (7th Cir. 1992); *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617

(Ill. App. Ct. 1998); *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 215 (Ill. App. Ct. 1995); *Serv. Ctrs. of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1136 (Ill App. Ct. 1989). However, the requirements emphasize different aspects of secrecy. The first requirement, that the information be sufficiently secret to impart economic value because of its relative secrecy, "precludes trade secret protection for information generally known or understood within an industry even if not to the public at large." *Pope*, 694 N.E.2d at 617. The second requirement, that the plaintiff take reasonable efforts to maintain the secrecy of the information, prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection. *See Jackson v. Hammer*, 653 N.E.2d 809, 816 (Ill. App. Ct. 1995) ("[T]he Act requires a plaintiff to take 'affirmative measures' to prevent others from using information.").

Although the Act explicitly defines a trade secret in terms of these two requirements, Illinois courts frequently refer to six common law factors (which are derived from § 757 of the Restatement (First) of Torts) in determining whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Delta Med. Sys. v. Mid-America Med. Sys., Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002); *Stampede Tool Warehouse*, 651 N.E.2d at 215-16; *George S. May Int'l Co. v. Int'l Profit Assocs.*, 628 N.E.2d 647,

653 (Ill. App. Ct. 1993); *see also C&F Packing Co., Inc. v. IBP, Inc.*, 224 F.3d 1296, 1302 (Fed. Cir. 2000) (applying Illinois law).

Contrary to Learning Curve's contention, we do not construe the foregoing factors as a six-part test, in which the absence of evidence on any single factor necessarily precludes a finding of trade secret protection. Instead, we interpret the common law factors as instructive guidelines for ascertaining whether a trade secret exists under the Act. The language of the Act itself makes no reference to these factors as independent requirements for trade secret status, and Illinois case law imposes no such requirement that each factor weigh in favor of the plaintiff. *See ILG Indus., Inc. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971) ("An exact definition of a trade secret, applicable to all situations, is not possible. Some factors to be considered in determining whether given information is one's trade secret are [the six factors enumerated in the Restatement].") (internal quotation marks omitted). In this respect, Illinois law is compatible with the approach in other states. Courts from other jurisdictions, as well as legal scholars, have noted that the Restatement factors are not to be applied as a list of requisite elements. *See, e.g., Basic American, Inc. v. Shatila*, 992 P.2d 175, 184 (Idaho 1999); *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 778 (Wis. 1989); 2 Gregory E. Upchurch, *Intellectual Property Litigation Guide: Patents & Trade Secrets* § 16.02, at 16-17 to 16-18 (2002) ("On the whole, these factors are a guide to the proper decision on the existence of a trade secret, not a list of requirements.").

The existence of a trade secret ordinarily is a question of fact.[2] As aptly observed by our colleagues on the Fifth

---

[2]  *See Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 675 (N.D. Ill. 1997) (applying Illinois law); *see also Penalty Kick Mgm't Ltd. v. Coca*

(continued...)

Circuit, a trade secret "is one of the most elusive and difficult concepts in the law to define." *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978). In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information constitutes a trade secret ordinarily is best "resolved by a fact finder after full presentation of evidence from each side." *Id.* at 289. We do not believe that the district court was sufficiently mindful of these principles. The district court, in effect, treated the Restatement factors as requisite elements and substituted its judgment for that of the jury. PlayWood presented sufficient evidence for the jury reasonably to conclude that the Restatement factors weighed in PlayWood's favor.

### 1.   Extent to which PlayWood's concept for noise-producing toy railroad track was known outside of Playwood's business

PlayWood presented substantial evidence from which the jury could have determined that PlayWood's concept for noise-producing toy railroad track was not generally known outside of Playwood's business. It was undisputed at trial that no similar track was on the market until Learning Curve launched Clickety-Clack Track™ in late 1994,

---

2   (...continued)
*Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003) (applying Georgia law); *Pate v. Nat'l Fund Raising Consultants, Inc.*, 20 F.3d 341, 344 (8th Cir. 1994) (applying Colorado law); *Chevron U.S.A. Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987) (applying New York law); 1 Melvin F. Jager, *Trade Secrets Law* § 5.2, at 5-3 (2002); 2 Gregory E. Upchurch, *Intellectual Property Litigation Guide: Patents & Trade Secrets* § 16.03, at 16-18 (2002).

more than a year after PlayWood first conceived of the concept. Of course, as Learning Curve correctly points out, "[m]erely being the first or only one to use particular information does not in and of itself transform otherwise general knowledge into a trade secret." *George S. May Int'l*, 628 N.E.2d at 654. "If it did, the first person to use the information, no matter how ordinary or well known, would be able to appropriate it to his own use under the guise of a trade secret." *Serv. Ctrs.*, 535 N.E.2d at 1137. However, in this case, there was additional evidence from which the jury could have determined that PlayWood's concept was not generally known within the industry.

First, there was substantial testimony that Learning Curve had attempted to differentiate its track from that of its competitors for several months, but that it had been unable to do so successfully.

Furthermore, PlayWood's expert witness, Michael Kennedy, testified that PlayWood's concept, as embodied in Clickety-Clack Track™, was unique and permitted "its seller to differentiate itself from a host of competitors who [were] making a generic product." Trial Tr. at 518. Kennedy explained that the look, sound and feel of the track made it distinct from other toy railroad track: "[W]hen a child runs a train across this track, he can feel it hitting those little impressions. And when you're talking about young children[,] having the idea that they can see something that they couldn't see before, feel something that they couldn't feel before, hear something that they couldn't hear before, that is what differentiates this toy from its other competitors." *Id.* at 489.

Finally, PlayWood presented evidence that Learning Curve sought and obtained a patent on the noise-producing track. It goes without saying that the requirements for patent and trade secret protection are not synonymous.

Unlike "a patentable invention, a trade secret need not be novel or unobvious." 2 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 14.15, at 14-124 (4th ed. 2003). "The idea need not be complicated; it may be intrinsically simple and nevertheless qualify as a secret, unless it is common knowledge and, therefore, within the public domain." *Forest Labs, Inc. v. Pillsbury Co.*, 452 F.2d 621, 624 (7th Cir. 1971) (internal quotation marks omitted). However, it is commonly understood that "[i]f an invention has sufficient novelty to be entitled to patent protection, it may be said *a fortiori* to be entitled to protection as a trade secret." 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.08[1], at 1-353 (2002) (internal footnotes omitted). In light of this evidence, we cannot accept Learning Curve's argument that no rational jury could have found that PlayWood's concept was unknown outside of its business.

### 2. Extent to which PlayWood's concept was known to employees and others involved in PlayWood's business

The district court did not address the extent to which PlayWood's concept was known to employees and others involved in PlayWood's business. However, we agree with PlayWood that the evidence was sufficient to establish that its concept for noise-producing track was known only by key individuals in its business.

At the outset, we note briefly that PlayWood was a small business, consisting only of Clausi and Moore. Illinois courts have recognized on several occasions that the expectations for ensuring secrecy are different for small companies than for large companies. *See Jackson*, 653 N.E.2d at 815 ("[T]he determination of what steps are

reasonably necessary to protect information is different for a large company than for a small one."); *Elmer Miller, Inc. v. Landis*, 625 N.E.2d 338, 342 (Ill. App. Ct. 1993) ("[R]easonable steps for a two or three person shop may be different from reasonable steps for a larger company."). Apart from Clausi (PlayWood's sole toy designer and the person who conceived of the concept for noise-producing track) and Moore (PlayWood's sole officer and director), the only person who knew about the concept was Borsato, the person who physically produced PlayWood's prototype at Clausi's direction. The concept was disclosed to Borsato in order for PlayWood to develop fully its trade secret. *See* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.04, at 1-173 (2002) ("A trade secret does not lose its character by being confidentially disclosed to agents or servants, without whose assistance it could not be made of any value.") (internal quotation marks omitted). Moreover, Borsato's actions were governed by a written confidentiality agreement with PlayWood. Indeed, as an extra precaution, Clausi even amended PlayWood's confidentiality agreement with Borsato immediately after the February 18, 1993, meeting to ensure that materials discussed during the meeting would remain confidential. From this evidence, the jury reasonably could have determined that this factor also weighed in favor of PlayWood.

### 3.   Measures taken by PlayWood to guard the secrecy of its concept

There also was sufficient evidence for the jury to determine that PlayWood took reasonable precautions to guard the secrecy of its concept. The Act requires the trade secret owner to take actions that are "reasonable under the circumstances to maintain [the] secrecy or confidentiality" of its trade secret; it does not require perfection. 765 ILCS

1065/2(d)(2). Whether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury.[3] Indeed, we previously have recognized that "only in an extreme case can what is a 'reasonable' precaution be determined [as a matter of law], because the answer depends on a balancing of costs and benefits that will vary from case to case." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991).

Here, the jury was instructed that it must find "by a preponderance of the evidence that PlayWood's trade secrets were given to Learning Curve as a result of a confidential relationship between the parties." Trial Tr. at 1449. By returning a verdict in favor of PlayWood, the jury necessarily found that Learning Curve was bound to PlayWood by a pledge of confidentiality. The jury's determination is amply supported by the evidence. Both Clausi and Moore testified that they entered into an oral confidentiality agreement with Abraham and Wilson before beginning their discussion on February 18, 1993. In particular, Clausi testified that he told Abraham and Wilson: "I also have some things, some ideas on how to produce the track and produce the trains now that I've had a chance to look at them for the last couple of days, and I think they're confidential as well. So if we're both okay with that, we should continue." Trial Tr. at 77. In addition to this testimony, the jury heard that Learning Curve had

---

[3] *See Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 943 (7th Cir. 1996); *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991); *see also* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.04, at 1-170 (2002); 2 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 14.26, at 14-209 (4th ed. 2003).

disclosed substantial information to PlayWood during the February 18th meeting, including projected volumes, costs and profit margins for various products, as well as drawings for toys not yet released to the public. The jury could have inferred that Learning Curve would not have disclosed such information in the absence of a confidentiality agreement. Finally, the jury also heard (from several of Learning Curve's former business associates) that Learning Curve routinely entered into oral confidentiality agreements like the one with PlayWood.

PlayWood might have done more to protect its secret. As Learning Curve points out, PlayWood gave its only prototype of the noise-producing track to Wilson without first obtaining a receipt or written confidentiality agreement from Learning Curve—a decision that proved unwise in hindsight. Nevertheless, we believe that the jury was entitled to conclude that PlayWood's reliance on the oral confidentiality agreement was reasonable under the circumstances of this case.[4] First, it is well established that "[t]he formation of a confidential relationship imposes upon the disclosee the duty to maintain the information received in the utmost secrecy" and that "the unprivileged use or disclosure of another's trade secret becomes the basis for an action in tort." *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985). Second, both Clausi and Moore testified that they believed PlayWood had a realistic

---

[4] We iterate that the proper inquiry is not whether, in our independent judgment, we believe that PlayWood took reasonable precautions to maintain the secrecy of its concept; rather, the issue is whether PlayWood's "failure to do more was so plain a breach of the obligation of a trade secret owner to make reasonable efforts to maintain secrecy as to justify" overturning the jury verdict in its favor. *Rockwell*, 925 F.2d at 177.

chance to "get in the door" with Learning Curve and to produce the concept as part of Learning Curve's line of Thomas products. Clausi and Moore did not anticipate that Learning Curve would violate the oral confidentiality agreement and utilize PlayWood's concept without permission; rather, they believed in good faith that they "were going to do business one day again with Learning Curve with respect to the design concept." Trial Tr. at 236-37. Finally, we believe that, as part of the reasonableness inquiry, the jury could have considered the size and sophistication of the parties, as well as the relevant industry. Both PlayWood and Learning Curve were small toy companies, and PlayWood was the smaller and less experienced of the two. Viewing the evidence in the light most favorable to PlayWood, as we must, we conclude that there was sufficient evidence for the jury to determine that PlayWood took reasonable measures to protect the secrecy of its concept.

### 4. Value of the concept to PlayWood and to its competitors

There was substantial evidence from which the jury could have determined that PlayWood's concept had value both to PlayWood and to its competitors. It was undisputed at trial that Learning Curve's sales skyrocketed after it began to sell Clickety-Clack Track™. In addition, PlayWood's expert witness, Michael Kennedy, testified that PlayWood's concept for noise-producing track had tremendous value. Kennedy testified that the "cross-cuts and changes in the [track's] surface" imparted value to its seller by causing the track to "look different, feel different and sound different than generic track." Trial Tr. at 504. Kennedy further testified that, in his opinion, the track would have commanded a premium royalty under a

negotiated license agreement because the "invention allows its seller to differentiate itself from a host of competitors who are making a generic product with whom it is competing in a way that is proprietary and exclusive, and it gives [the seller] a significant edge over [its] competition." *Id.* at 518-19.

Despite this evidence, the district court concluded that PlayWood's concept had no economic value. The court's conclusion was based, in part, on the fact that PlayWood's prototype did not work perfectly; as noted by the court, the first set of cuts were too shallow to produce sound and the second set of cuts were too deep to permit the train to roll smoothly across the track. In the district court's view, even if the concept of cutting grooves into the wooden track in order to produce noise originated with Clausi, the concept lacked value until it was refined, developed and manufactured by Learning Curve.

We cannot accept the district court's conclusion because it is belied by the evidence. At trial, Kennedy was asked whether, in his opinion, the fact that PlayWood's prototype did not work perfectly affected the value of PlayWood's concept, and he testified that it did not. *See* Trial Tr. at 578. Kennedy testified that he would assign the same value to PlayWood's concept as it was conceived on February 18, 1993, as he would the finished product that became known as Clickety-Clack Track™ because, at that time, he would have known "that most of the design [had] already been done and that [he] just need[ed] to go a little bit further to make it really lovely." *Id.* at 578. Kennedy further testified that it was standard practice in the industry for a license to be negotiated based on a prototype (much like the one PlayWood disclosed to Learning Curve) rather than a finished product and that the license generally would cover the prototypical design,

as well as any enhancements or improvements of that design. *See* Trial Tr. at 500-01.[5] Based on this testimony, we

---

[5] Specifically, Kennedy testified:

Q: Now, when you were at Tyco, you were in the toy business and people were bringing you inventions, did people bring you inventions or trade secrets that were in the kind of form that we find Defendants' Exhibit 9 [Clickety-Clack Track], fully polished and finished and so on?

A: I've seen some pretty rough-looking toys in meeting with inventors. I've seen toys that were obviously made by hand. I've seen toys that had cracks, seams and joints that you don't expect to see when they're manu- factured. Certainly that's true. . . . So the answer is: You don't see a final product when you meet with an inventor. You see a preliminary product or a prototype kind of product.

Q: Now, when a prototype is brought to you as a disclo- sure, as a secret, as an invention that somebody wants to license to you, does it make a difference to you whether it's a prototype or a finished product?

A: Not necessarily, because it depends on who is going to make it, which is uncertain at the time. It depends on how difficult it is to make, which could be uncertain at that time. It's helpful if we know that it's easy to make. It's helpful if we know how much it costs to make. But you don't always know that.

Q: When you go to license that kind of invention that's brought to you, is it your intent to license only the prototype that's brought to you?

A: No. I think every license agreement that I negotiate in the toy industry includes the prototypical design. It includes enhancements and improvements on that

(continued...)

cannot accept the district court's conclusion that Play-Wood's concept possessed no economic value.

It is irrelevant under Illinois law that PlayWood did not actually use the concept in its business. "[T]he proper criterion is not 'actual use' but whether the trade secret is 'of value' to the company." *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983).[6] Kennedy's testimony was more than sufficient to permit the jury to conclude that the concept was "of value" to PlayWood. It is equally irrelevant that PlayWood did not seek to patent its concept. So long as the concept remains a secret, *i.e.*, outside of the public domain, there is no need for patent

---

[5] (...continued)

> design, regardless of whether they're made by the inventor or whether they're made by the manufacturer. It includes something called line extensions, which is the transfer of this invention to a toy which maybe wasn't first thought of for its application. It includes all of those things.

Trial Tr. at 499-501.

[6] Both the Uniform Trade Secrets Act and the Restatement (Third) of Unfair Competition expressly reject prior use by the person asserting rights in the information as a prerequisite to trade secret protection. *See* Unif. Trade Secrets Act § 1 cmt. (1990) ("The broader definition in the proposed Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use."); Restatement (Third) of Unfair Competition § 39 cmt. e (1995) ("Use by the person asserting rights in the information is not a prerequisite to protection under the rule stated in this Section," in part, because such a "requirement can deny protection during periods of research and development and is particularly burdensome for innovators who do not possess the capability to exploit their innovations.").

protection. Professor Milgrim makes this point well: "Since every inventor has the right to keep his invention secret, one who has made a patentable invention has the option to maintain it in secrecy, relying upon protection accorded to a trade secret rather than upon the rights which accrue by a patent grant." 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.08[1], at 1-353 (2002). It was up to PlayWood, not the district court, to determine when and how the concept should have been disclosed to the public.

### 5. Amount of time, effort and money expended by PlayWood in developing its concept

PlayWood expended very little time and money developing its concept; by Clausi's own account, the cost to PlayWood was less than one dollar and the time spent was less than one-half hour. The district court determined that "[s]uch an insignificant investment is . . . insufficient as a matter of Illinois law to establish the status of a 'trade secret.'" R.202 at 16. We believe that the district court gave too much weight to the time, effort and expense of developing the track.[7]

---

[7] Professor Milgrim, for one, rejects any per se requirement of developmental costs:

> Where cost is referred to it is almost always invariably incidental to other, basic definitional elements, such as secrecy. Since it is established that a trade secret can be discovered fortuitously (ergo, without costly development), or result purely from the exercise of creative facilities, it would appear inconsistent to consider expense of development of a trade secret as an operative substantive element.

*See* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.02[2], at 1-146 & 1-150 (2002) (internal footnotes omitted).

Although Illinois courts commonly look to the Restatement factors for guidance in determining whether a trade secret exists, as we have noted earlier, the requisite statutory inquiries under Illinois law are (1) whether the information "is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use;" and (2) whether the information "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). A significant expenditure of time and/or money in the production of information may provide evidence of value, which is relevant to the first inquiry above. However, we do not understand Illinois law to require such an expenditure in all cases.

As pointed out by the district court, several Illinois cases have emphasized the importance of developmental costs. However, notably, none of those cases concerned the sort of innovative and creative concept that we have in this case. Indeed, several of the cases in Illinois that emphasize developmental costs concern compilations of data, such as customer lists.[8] In that context, it makes

---

[8] *See, e.g., Delta Med. Sys. v. Mid-America Med. Sys., Inc.*, 772 N.E.2d 768, 781 (Ill. App. Ct. 2002) ("Delta presented no testimony at the hearing as to the amount of effort expended in acquiring its customer list."); *Strata Mktg., Inc. v. Murphy*, 740 N.E.2d 1166, 1177 (Ill. App. Ct. 2000) ("Strata's customer lists, which it alleged take considerable effort, time, and money to compile, could be deemed a trade secret."); *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995) ("The customer list has been developed through the laborious method of prospecting, which requires a substantial amount of time, effort, and expense by Stampede."); *Springfield Rare Coin*
(continued...)

sense to require the expenditure of significant time and money because there is nothing original or creative about the alleged trade secret. Given enough time and money, we presume that the plaintiff's competitors could compile a similar list.

Here, by contrast, we are dealing with a new toy design that has been promoted as "the first significant innovation in track design since the inception of wooden train systems." PlayWood's Tr. Ex.71. Toy designers, like many artistic individuals, have intuitive flashes of creativity. Often, that intuitive flash is, in reality, the product of earlier thought and practice in an artistic craft. We fail to see how the value of PlayWood's concept would differ in any respect had Clausi spent several months and several thousand dollars creating the noise-producing track. Accordingly, we conclude that PlayWood's lack of proof on this factor does not preclude the existence of a trade secret.

---

[8] (...continued)
*Galleries, Inc. v. Mileham*, 620 N.E.2d 479, 485 (Ill. App. Ct. 1993) ("Under Illinois law, customer lists and other customer information will constitute confidential information *only* when the information has been developed by the employer over a number of years at great expense and kept under tight security."); *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1344 (Ill. App. Ct. 1993) ("Items such as customer lists, pricing information, and business techniques can be trade secrets if the employer has developed the information over a number of years at great expense and kept [it] under tight security.") (internal quotation marks omitted); *Prudential Ins. Co. of America v. Van Matre*, 511 N.E.2d 740, 745 (Ill. App. Ct. 1987) ("A customer list or other customer information constitutes a trade secret in which an employer holds a protectable interest where the employer developed the information over a number of years, at great expense, and kept the information under lock and key.").

### 6. Ease or difficulty with which PlayWood's concept could have been properly acquired or duplicated by others

Finally, we also believe that there was sufficient evidence for the jury to determine that PlayWood's concept could not have been easily acquired or duplicated through proper means. PlayWood's expert witness, Michael Kennedy, testified: "This is a fairly simple product if you look at it. But the truth is that because it delivers feeling and sound as well as appearance, it isn't so simple as it first appears. It's a little more elegant, actually, than you might think." Trial Tr. at 504. In addition to Kennedy's testimony, the jury heard that Learning Curve had spent months attempting to differentiate its track from Brio's before Clausi disclosed PlayWood's concept of noise-producing track. From this evidence, the jury could have inferred that, if PlayWood's concept really was obvious, Learning Curve would have thought of it earlier.

Despite this evidence, the district court concluded that PlayWood's concept was not a trade secret because it could have been easily duplicated, stating that "[h]ad PlayWood succeeded in producing and marketing [the] notched track, the appearance of the track product itself would have fully revealed the concept PlayWood now claims as a secret." R.202 at 5-6. Of course, the district court was correct in one sense; PlayWood's own expert recognized that, in the absence of patent or copyright protection, the track could have been reverse engineered just by looking at it. *See* Trial Tr. at 562. However, the district court failed to appreciate the fact that PlayWood's concept was not publicly available. As Professor Milgrim states: "A potent distinction exists between a trade secret which *will be* disclosed if and when the product in which it is embodied is placed on sale, and a 'trade secret' embodied in a product which has been placed on sale, which prod-

uct admits of discovery of the 'secret' upon inspection, analysis, or reverse engineering." 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.05[4], at 1-228 (2002). "Until disclosed by sale the trade secret should be entitled to protection." *Id.; see also* 2 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 14.15, at 14-123 (4th ed. 2003) ("The fact that a secret is easy to duplicate after it becomes known does not militate against its being a trade secret prior to that time."). Reverse engineering can defeat a trade secret claim, but only if the product could have been properly acquired by others, as is the case when the product is publicly sold. Here, PlayWood disclosed its concept to Learning Curve (and Learning Curve alone) in the context of a confidential relationship; Learning Curve had no legal authority to reverse engineer the prototype that it received in confidence. *See Laff v. John O. Butler Co.*, 381 N.E.2d 423, 433 (Ill. App. Ct. 1978) ("[A] trade secret is open to anyone, not bound by a confidential relationship or a contract with the secret's owner, who can discover the secret through lawful means."). Accordingly, we must conclude that the jury was entitled to determine that PlayWood's concept could not easily have been acquired or duplicated through proper means.

### B. Exemplary Damages

The Illinois Trade Secrets Act authorizes exemplary damages of up to twice the amount of compensatory damages if there was a "willful and malicious misappropriation." 765 ILCS 1065/4(b). The jury was not given an instruction on exemplary damages because the district court granted Learning Curve's motion for judgment as a matter of law on this issue prior to closing argument. *See* Trial Tr. at 1355. PlayWood submits that the jury should have been permitted to determine whether Learning

Curve's intentional misappropriation of PlayWood's trade secret in the realistic looking and sounding toy railroad track justified an award of exemplary damages. *See Medow v. Flavin*, 782 N.E.2d 733, 746 (Ill. App. Ct. 2002) (stating generally that "the question of whether a defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages is for the jury to decide") (quoting *Schmidt v. Ameritech Illinois*, 768 N.E.2d 303 (Ill. App. Ct. 2002)).

There are no Illinois cases construing the phrase "willful and malicious misappropriation" under the Act. However, we previously have held that the phrase includes "an intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another." *Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 946 (7th Cir. 1996); *see also Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605, at *19 (N.D. Ill. Apr. 28, 2003); *RKI, Inc. v. Grimes*, 177 F. Supp.2d 859, 879 (N.D. Ill. 2001); *Richardson Elecs., Ltd. v. Avnet, Inc.*, No. 98 C 5095, 1999 WL 59976, at *5 (N.D. Ill. Feb. 6, 1999); *but see Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1120 (Fed. Cir. 1996) (holding that exemplary damages are not permitted under the Act when the defendant was motivated by competition, rather than by malice).[9]

---

[9] In other contexts, Illinois courts routinely have held that "exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978); *see also Medow v. Flavin*, 782 N.E.2d 733, 747 (Ill. App. Ct. 2002); *Tucker v. Illinois Power Co.*, 597 N.E.2d 220, 231 (Ill. App. Ct. 1992).

We agree with PlayWood that a rational jury could determine that exemplary damages are justified in this case. Specifically, we believe that a rational jury could determine that Learning Curve intentionally misappropriated PlayWood's trade secret in the noise-producing track and then attempted to conceal the misappropriation by creating false evidence of prior independent development. Accordingly, we remand this case to the district court with the instruction to hold a jury trial on exemplary damages.[10]

---

[10] We decline to consider PlayWood's argument that the district court erred by excluding under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the testimony of PlayWood's ink expert that a handwritten entry in Lee's "100-Day Agenda" relating to noise-producing track was not written contemporaneously with the other handwritten entries. Rule 10(b)(2) of the Federal Rules of Appellate Procedure provides that "[i]f the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion." Fed. R. App. P. 10(b)(2). PlayWood did not request that the transcript of the *Daubert* hearing be included in the record on appeal. As a result, we are unable to evaluate whether the district court erred in excluding the testimony of PlayWood's ink expert; accordingly, PlayWood has forfeited this argument. *See Hotaling v. Chubb Sovereign Life Ins. Co.*, 241 F.3d 572, 581 (7th Cir. 2001); *LaFollette v. Savage*, 63 F.3d 540, 545 (7th Cir. 1995); *Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110, 1117 (7th Cir 1990). We recognize that, as an alternative to forfeiture, we have the authority under Rule 10(e) of the Federal Rules of Appellate Procedure to order PlayWood to supplement the record to include the *Daubert* hearing. *See* Fed. R. App. P. 10(e); *see also LaFollette*, 63 F.3d at 545. However, we decline to exercise that authority in this case because PlayWood "ha[s] had ample

(continued...)

We leave it to the district court on remand to consider PlayWood's request for attorneys' fees. *See* 765 ILCS 1065/5(iii) (permitting the court to award reasonable attorneys' fees to the prevailing party where "willful and malicious misappropriation exists").

### Conclusion

For the foregoing reasons, the judgment of the district court is reversed, and the jury's verdict is reinstated. The case is remanded to the district court for a jury trial on exemplary damages and for consideration of attorneys' fees by the court. PlayWood may recover its costs in this court.

REVERSED and REMANDED

---

[10] (...continued)
opportunity to correct the problem but ha[s] failed to do so." *LaFollette*, 63 F.3d at 545. Learning Curve pointed out in its answer brief that the *Daubert* hearing was not made part of the record on appeal. *See* Appellees' Br. at 41 ("PlayWood would have this Court undertake a *de novo* review and reverse the trial court's ruling on the admissibility of expert testimony, rendered after a *Daubert* hearing, without any reference to the evidence introduced at that hearing! Indeed, PlayWood has not included the hearing transcript in the record before the Court."). Despite notice of Learning Curve's objection to the incomplete record, PlayWood made no attempt to supplement the record or to explain why a transcript of the hearing was not necessary to permit meaningful appellate review.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
