**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

IVS HYDRO, INCORPORATED, a West
Virginia corporation; GENERAL
MANAGEMENT SERVICES,
INCORPORATED, a West Virginia
corporation,

<em>Plaintiffs-Appellants,</em>

v.

JACKIE RAY ROBINSON; ONYX
INDUSTRIAL SERVICES, INCORPORATED,
a Delaware corporation; ONYX
PRECISION SERVICES, INCORPORATED, a
Delaware corporation,

<em>Defendants-Appellees.</em>

No. 03-1827

IVS HYDRO, INCORPORATED, a West
Virginia corporation; GENERAL
MANAGEMENT SERVICES,
INCORPORATED, a West Virginia
corporation,

<em>Plaintiffs-Appellees,</em>

v.

JACKIE RAY ROBINSON; ONYX
INDUSTRIAL SERVICES, INCORPORATED,
a Delaware corporation; ONYX
PRECISION SERVICES, INCORPORATED, a
Delaware corporation,

<em>Defendants-Appellants.</em>

No. 03-1898

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph Robert Goodwin, District Judge.
(CA-01-1296-2)

Argued: February 25, 2004

Decided: March 31, 2004

Before WILKINS, Chief Judge, MICHAEL, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Bryant Jonathan Spann, ALLEN, GUTHRIE, MCHUGH
& THOMAS, P.L.L.C., Charleston, West Virginia, for Appellants/
Cross-Appellees. John Philip Melick, JACKSON KELLY, P.L.L.C.,
Charleston, West Virginia, for Appellees/Cross-Appellants. **ON
BRIEF:** Robert B. Allen, ALLEN, GUTHRIE, MCHUGH &
THOMAS, P.L.L.C., Charleston, West Virginia, for Appellants/
Cross-Appellees. Stephanie H. D. Mullett, JACKSON KELLY,
P.L.L.C., Charleston, West Virginia, for Appellees/Cross-Appellants.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

**OPINION**

PER CURIAM:

IVS Hydro, Incorporated (IVS) and General Management Services, Incorporated (GMS) appeal the district court's grant of summary judgment in favor of Jackie Ray Robinson (Robinson), Onyx Industrial Services, Incorporated, and Onyx Precision Services, Incorporated on IVS and GMS's claims under West Virginia law for misappropriation of trade secrets, tortious interference with contract, and breach of fiduciary duty.[1] We affirm.

I

A

IVS is a West Virginia corporation headquartered in Waverly, West Virginia. Since its founding in 1972, IVS has provided cleaning services for industrial facilities, including hydro-blasting and industrial vacuuming. Although IVS has served numerous businesses in the mid-Ohio valley, only its relationship with four customers, Solvay Advanced Polymers (Solvay), Kraton Polymers (Kraton), American Municipal Power (AMP), and Allegheny Power (Allegheny), are relevant to this case. GMS likewise is a West Virginia corporation and is the largest shareholder of IVS. GMS is owned by Fred Clark (Clark), who has served as IVS's general manager since 2000 and as IVS's corporate secretary since its founding.[2] Onyx is a Delaware corporation based in Texas, with office locations that include Vienna and Nitro, West Virginia.

IVS and Onyx compete vigorously in the provision of industrial cleaning services to customers in the mid-Ohio valley. They solicit each other's customers, including AMP, Solvay, Kraton, and Allegheny. Both IVS and Onyx had no guarantee of work under its "blan-

---

[1]Onyx Precision Services, Incorporated has been merged into Onyx Industrial Services, Incorporated. For ease of reference, we will refer to the corporate defendants as Onyx.

[2]For ease of reference from this point on, we will refer to both IVS and GMS as IVS.

ket orders." Rather, each customer was non-exclusive and could and did call on competing vendors in its sole discretion.

IVS and Onyx also compete for the hiring of competent employees who have established relationships with customers. Indeed, the record reflects that, not only did Onyx routinely seek to employ personnel from its competitors, so did IVS. Both IVS and Onyx held outings, such as picnics, to recruit employees. These efforts by IVS and Onyx, as well as other industrial cleaning services companies operating in the mid-Ohio valley, resulted in the frequent movement of salespersons and superintendents from one industrial cleaning services company to another. As a consequence of this frequent movement, ballpark rates for industrial cleaning services were common knowledge in the mid-Ohio valley industrial cleaning services marketplace.

From 1977 to 1985, Robinson served as a field worker and part-time foreman for IVS, performing high-pressure water cleaning. After pursuing another career for the next seven years, Robinson returned to IVS in 1992, where he initially worked in the equipment repair shop. After approximately eight months, Robinson was promoted to a sales position and he remained involved in sales for the next nine years. On October 1, 2001, Robinson went to work for Onyx performing substantially the same job as he performed at IVS. In large part, this case concerns the circumstances surrounding Robinson and some other IVS employees' decision to go to work for Onyx in October 2001. Of note, the IVS employees at issue in this case were hired as at-will employees. Not a single employee whose departure was at issue in this case had any written confidentiality or non-compete agreement with IVS.

According to IVS, its greatest confidence at issue in this case was its confidential pricing information. Some of IVS's pricing proposals were marked confidential, but others were not. Some of IVS's pricing proposals were kept under lock and key, but others were not. IVS's pricing and billing rates were contained on a computer network that was password protected. However, every IVS employee that had access to IVS's computer network had access to IVS's pricing information.

In 2000, Clark instituted an aggressive expansion effort, and, by the summer of 2000, many employees were unhappy with the contro-

versial changes in the company's management style. Robinson, in particular, was upset when Clark hired two bankers as vice-presidents over all the other longstanding employees. By the summer of 2001, many IVS employees began to look for work elsewhere. In fact, shortly before the departures at issue, about a dozen employees left IVS to work for a competitor of both IVS and Onyx.

By the late summer of 2001, Robinson and fellow IVS employees James Eddy (Eddy), Steven Hicks (Hicks), Marty McBrayer (McBrayer), and Fred Cline (Cline) were investigating alternative employment opportunities.[3] In early September 2001, Robinson approached Eddy after an IVS meeting and told him that he, Hicks, McBrayer, and Cline were displeased with Clark's leadership and were looking to go somewhere else to work. Eddy said he knew people at Onyx and would give them a call.

A short time later, Eddy called Daniel Wright (Wright), an Onyx vice-president, to tell him about the IVS employees' interest in leaving IVS. Later that week, Eddy called Wright again and set up a lunch meeting for a few days later in Wheelersburg, Ohio. Present at the lunch meeting were Wright, Eddy, and Cline. During the meeting, Eddy and Cline told Wright that they, along with other IVS employees, wanted to leave IVS and work elsewhere.

Eddy and Wright then arranged for a second meeting, this time at Eddy's farm in Belpre, Ohio. Present at that meeting were Cline, Eddy, Hicks, Robinson, Wright, and Ronnie Burdette (Burdette), who was the Onyx manager whose territory encompassed the mid-Ohio Valley. During the meeting, the IVS employees said they were going to leave IVS, were looking for another employer, and had already talked to some others. Wright and Burdette made no offers of employment, but made sure that none of the IVS employees had any confidentiality or non-compete agreements with IVS. The IVS employees complained about Clark's poor management and said that many other employees were upset and that some had already left, as, in fact, they had. Those present also discussed which customers might wish to purchase services from Onyx if these employees were to be hired by

---

[3]Eddy was IVS's operations manager; Hicks and McBrayer were IVS supervisors; and Cline was an IVS salesman.

Onyx. At this meeting, Robinson provided "a rough figure of what the rates were in the valley." However, Robinson deliberately was not too specific because he did not know if he was going to go to work for Onyx.

After obtaining authority to proceed, Wright, on September 10, 2001, sent offers to Cline, Eddy, Hicks, McBrayer, and Robinson. On September 17, 2001, Wright met with the five to discuss the offers. On September 18, 2001, Cline and Eddy resigned from IVS. Thereafter, Burdette, Wright, and Connie Johnson (Johnson), who was responsible for Onyx's human resources in the territory encompassing the mid-Ohio Valley, had a conference call with Cline, Eddy, Hicks, McBrayer, and Robinson so that Johnson could answer questions about benefits and other details of employment. On September 24, 2001, Wright sent a revised employment offer to Robinson, articulating some of the changes that Robinson had requested.

On September 28, 2001, Robinson, Hicks, and McBrayer resigned from IVS. The following day, Cline, Eddy, Hicks, McBrayer, and Robinson met with Burdette and Wright to pick up their Onyx company vehicles so they could start work for Onyx on October 1, 2001. At this time, the former IVS employees indicated that many of IVS's hourly employees who had been working under their supervision may also want to come to work for Onyx. John Bills (Bills), an IVS technician, contacted many of these IVS hourly employees and encouraged them to go to Onyx's Vienna, West Virginia facility on October 1, 2001 to find out about working for Onyx.

On October 1, 2001, Cline, Eddy, Hicks, McBrayer, and Robinson arrived for their first day of work at Onyx. Numerous IVS hourly employees arrived at Onyx as well. Johnson and her assistant enrolled Cline, Eddy, Hicks, McBrayer, and Robinson in Onyx's various benefit programs and provided employment information and applications to the IVS hourly employees who arrived. Numerous IVS hourly employees applied for work at Onyx and were hired; some of them decided not to move, including Bills.[4]

---

[4]According to IVS, when the IVS hourly employees went to Onyx on October 1, 2001, Robinson allegedly told the employees that they intended to "destroy" IVS. Robinson allegedly told another attendee that IVS would be "shut down" by January 1, 2002.

On his first day of employment, Robinson drafted a pricing proposal for industrial cleaning services for Solvay, a company at which Robinson had an established relationship.[5] The Onyx pricing proposal submitted to Solvay proved to be similar, in many respects, to the most recent proposal IVS submitted to Solvay, only with lower prices. Robinson, along with another Onyx employee, later called on Solvay and Onyx was awarded the work. According to IVS, Robinson drafted similar low-price proposals and submitted them to Kraton, AMP, and Allegheny, resulting in IVS losing business with these companies.

B

On December 19, 2001, IVS filed suit against Robinson and Onyx in the United States District Court for the Southern District of West Virginia. IVS's complaint set forth the following claims under West Virginia law: (1) civil conspiracy; (2) two causes of action for tortious interference with contract; (3) defamation; (4) breach of fiduciary duty; (5) misappropriation of trade secrets; (6) conspiracy in restraint of trade; (7) interference with prospective business advantage; and (8) fraud.

In May 2002, the district court dismissed IVS's conspiracy in restraint of trade claim and IVS later abandoned its interference with prospective business advantage claim. On May 31, 2002, Onyx and Robinson answered IVS's complaint and Robinson counterclaimed, seeking certain unpaid commissions. The parties later settled Robinson's counterclaim.

After completing discovery, Onyx and Robinson moved for summary judgment as to each of IVS's remaining claims. IVS likewise moved for summary judgment as to its misappropriation of trade secrets and tortious interference with contract claims. On May 29,

---

[5]Each year, Robinson took Solvay representatives to play golf, at IVS's expense. Of note, at one point during the August 2001 outing, Robinson asked a Solvay representative whether he could get on Solvay's bidder's list for future business in the event that he were to purchase Hydro Power, a company that provided industrial cleaning services and competed with both IVS and Onyx. Robinson never purchased Hydro Power.

2003, the district court granted summary judgment to Robinson and Onyx as to each of IVS's remaining claims. IVS filed a timely noticed of appeal from that order.

On June 12, 2003, Onyx and Robinson moved the district court to award to them their attorney's fees incurred in defending IVS's claim for misappropriation of trade secrets. The district court denied that motion on July 22, 2003, and Onyx and Robinson filed a timely notice of cross-appeal.

II

On appeal, IVS argues that the district court erred when it granted summary judgment in favor of Robinson and Onyx on IVS's claims under West Virginia law for misappropriation of trade secrets, tortious interference with contract, and breach of fiduciary duty. Only the district court's grant of summary judgment on IVS's misappropriation of trade secrets claim warrants discussion.[6]

IVS argues that the district court erred when it granted summary judgment in favor of Robinson and Onyx on IVS's misappropriation of trade secrets claim because Robinson and Onyx misappropriated IVS's trade secrets when Robinson used IVS's "confidential" pricing information in formulating the Onyx bids submitted to Solvay, Kraton, AMP, and Allegheny. The district court rejected IVS's misappropriation of trade secrets claim, reasoning that the information Robinson had from his experience at IVS did not qualify as a trade secret and the efforts IVS took to maintain the secrecy of its pricing information did not rise to the level necessary to qualify the pricing information as a trade secret. Moreover, the court concluded that Robinson and Onyx did not misappropriate the alleged trade secret.

We review the district court's grant of summary judgment *de novo*. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). Summary judgment is appropriate only when "there is no gen-

---

[6]We have reviewed IVS's arguments attacking the district court's grant of summary judgment to Robinson and Onyx on IVS's claim for breach of fiduciary duty and its two claims for tortious interference with contract and find those arguments to be without merit.

uine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the grant of summary judgment, we view the facts in the light most favorable to IVS, the nonmoving party, drawing all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In evaluating the district court's decision regarding IVS's misappropriation of trade secrets claim, we agree with the parties that we look to West Virginia law in this diversity case. Under the West Virginia Uniform Trade Secrets Act, a trade secret is defined as "information" that (1) derives "independent economic value" from "not being generally known" or "readily ascertainable" by others who can obtain economic value from its use or disclosure; and (2) is the subject of "efforts that are reasonable under the circumstances to maintain" the secrecy of the information. W. Va. Code Ann. §§ 47-22-1(d)(1), (2). If IVS's pricing information constitutes a trade secret, we must then determine whether the pricing information was misappropriated by Robinson and Onyx. *Id.* §§ 47-22-1(b), 47-22-3.

In *State ex rel. Johnson v. Tsapis*, 419 S.E.2d 1 (W. Va. 1992), the Supreme Court of Appeals of West Virginia adopted the six-factor test found in § 757 of the Restatement of Torts to determine whether there was good cause to issue a protective order to prevent the disclosure of the defendant's trade secrets. *Id.* at 3. The factors set forth in *Tsapis* are as follows:

> (1)   [T]he extent to which the information is known outside of the defendant's business;
>
> (2)   [T]he extent to which it is known by employees and others involved in the defendant's business;
>
> (3)   [T]he extent of the measures taken by the defendant to guard the secrecy of the information;
>
> (4)   [T]he value of the information to the defendant and competitors;

(5)    [T]he amount of effort or money expended by the defendant in developing the information; and

(6)    [T]he ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* A similar formulation of this six-factor test has been applied by other courts in determining whether a trade secret exists. *See, e.g.*, *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003) (applying similar six-factor test under Illinois law to determine whether a trade secret existed); *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (applying similar six-factor test under Colorado law to determine whether a trade secret existed). Under the six-factor test set forth above, which we believe the West Virginia Supreme Court of Appeals would apply in determining whether a trade secret exists in this case, the absence of evidence on any single factor does not necessarily preclude a finding of a trade secret. *Learning Curve Toys, Inc.*, 342 F.3d at 722; *Harvey Barnett, Inc.*, 338 F.3d at 1129. Rather, the factors should be weighed together in making that determination. *Learning Curve Toys, Inc.*, 342 F.3d at 722.

When examining these six factors, it becomes readily apparent that no trade secret existed in this case. With regard to the extent to which IVS's pricing information was known outside of its business, the record reflects that ballpark rates for industrial cleaning services in the mid-Ohio valley were common knowledge. Moreover, the customers of both IVS and Onyx were non-exclusive and could and did call on competing vendors in their sole discretion. The record also reflects that both IVS and Onyx, as well as other companies similarly situated, aggressively hired competent employees from each other and their competitors. Consequently, employees, including salesman, flowed freely from company to company like the tides. These market conditions made pricing information, including the manner in which it was compiled, no big secret in the mid-Ohio valley industrial cleaning services marketplace.

With regard to the second factor, the record reflects that IVS's pricing information was widely known by its employees. Indeed, every

IVS employee that had access to IVS's computer network had access to IVS's pricing information.

With regard to the third factor, while it is true that some steps were taken to keep IVS's pricing information confidential, these steps did little to keep IVS's pricing information confidential. Not a single employee whose departure was at issue had a written confidentiality or non-compete agreement with IVS. *Id.* at 724-26 (stressing the importance of confidentiality agreements in determining whether information should be regarded as a trade secret). Some IVS proposals were marked confidential, but others were not. Finally, as a matter of practice, IVS did not require its customers to refrain from disclosing IVS's pricing information to other potential sources of industrial cleaning services. *Cf. Motor City Bagels, L.L.C. v. The American Bagel Co.*, 50 F. Supp.2d 460, 480 (D. Md. 1999) (company did not meet secrecy requirement when it failed to exact secrecy agreements from potential investors and the exclusivity language was ineffective).

With regard to factor four, there is little doubt that this factor weighs in IVS's favor, as its pricing information was undoubtedly an asset to IVS and was a weapon that could be used by a competitor. With regard to factor five, the record does not reflect that IVS expended a great deal of money in formulating its pricing information; rather, IVS heavily relied on the practical experience of its sales force, which included Robinson and his lengthy background in the industrial cleaning services industry. Moreover, IVS's pricing information is not patented nor is it licensed to others for their use. With regard to factor six, the record does not reflect that IVS's approach to pricing was in any way unique so as to prevent a competitor from easily duplicating IVS's pricing techniques.

Weighing the six factors in their totality, we conclude that IVS's pricing information does not constitute a trade secret. IVS's approach to pricing was not unique and IVS did not expend a great deal of money developing its pricing techniques. Moreover, IVS only took minimal steps to ensure the confidentiality of its pricing information and there is little doubt that every IVS employee that had access to IVS's computer network had access to its pricing information. Finally, rates for industrial cleaning services were common knowledge in the marketplace as evinced by the market conditions in the

mid-Ohio valley. Based on this evidence, we agree with the district court that IVS's pricing information does not constitute a trade secret. Accordingly, we need not address whether Robinson and Onyx misappropriated IVS's pricing information.

III

On cross-appeal, Robinson and Onyx argue that the district court abused its discretion when it denied their motion for attorney's fees incurred in defending IVS's claim for misappropriation of trade secrets. We review "the denial of an award for attorney fees for abuse of discretion." *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001). An abuse of discretion only arises if the district court's "conclusions are based on mistaken legal principles or clearly erroneous factual findings." *Id.*

Robinson and Onyx seek the attorney's fees award pursuant to the West Virginia Uniform Trade Secrets Act, which permits recovery of attorney's fees by a prevailing party if the court determines that a claim of misappropriation of trade secrets was made in bad faith. W. Va. Code Ann. § 47-22-4. In this connection, Robinson and Onyx concede that the issue of bad faith is to be determined by the court, utilizing an objective reasonableness standard.

In rejecting Robinson and Onyx's motion for attorney's fees, the district court primarily relied on the West Virginia rules governing attorney conduct in litigation. According to the court, the action was not brought in bad faith because at no time before or during the litigation was it apparent to counsel that the misappropriation of trade secrets claim was frivolous or lacked a good faith basis.

The gist of Robinson and Onyx's argument is that the district court erred when it looked to the West Virginia rules governing attorney conduct in litigation to provide the standard governing its decision. Specifically, Robinson and Onyx argue that the West Virginia rules governing attorney conduct in litigation evaluate only the good faith of an attorney bringing a claim, not the good faith of the client on whose behalf the attorney acts. This distinction has no relevance in this case. Obviously, an attorney cannot ethically bring and *maintain* a claim on behalf of a client who is pressing the same claim in bad

faith. Thus, by finding that IVS's trade secret arguments were not frivolous and were made in good faith before and during the litigation, the district court necessarily concluded that IVS itself was not pursuing that claim in bad faith.

In summary, we simply cannot conclude that the district court abused its discretion in refusing to grant attorney's fees to Robinson and Onyx in this case.

IV

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*