**UTSTARCOM, INC., Plaintiff,**

v.

**STARENT NETWORKS, CORP.;** John ("Andy") Capener; Noel Charath; Dale Eliason; Brian Espy; Troy Gabel; Matthew Harper; Todd Kelly; Nick Lopez; Sanil Puthiy Andyil; Rajesh Ramankutty; Charles Rygula; Paul Shieh; Gennady Sirota; Amit Tiwari; James ("Jim") Wininger; Mark Zarich, **Defendants.**

Civil Action No. 07–CV–2582.

United States District Court, N.D. Illinois, Eastern Division.

June 2, 2009.

James Kenway Archibald, Randolph S. Sergent, Venable LLP, Baltimore, MD, Joanna M. Esty, Christopher Rudd, Christopher Todd Williams, Jackie M. Joseph, Thomas J. Speiss, Venable LLP, Los Angeles, CA, Bernard J. Nussbaum, Sonnenschein, Nath & Rosenthal, LLP, Marina N. Saito, Steven M. Lubezny, Loeb & Loeb LLP, Chicago, IL, James R. Burdett, Jeffrey L. Eichen, Venable, LLP, Washington, DC, for Plaintiff.

Arthur Gollwitzer, III, Christopher R. Parker, Michael Best & Friedrich LLP, Chicago, IL, Christopher S. Schultz, Lawrence R. Robins, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Cambridge, MA, E. Robert Yoches, James T. Wilson, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, Scott A. Herbst, Scott R. Mosko, Finnegan, Henderson, Farabow, Garrett & Dunner LLP, Palo Alto, CA, for Defendants.

### *DECISION AND SPECIAL MASTER ORDER NO. 21*

EDWARD A. BOBRICK (Ret.), Special Master.

Before the undersigned is Plaintiff's UTStarcom, Inc. ("UTSI") MOTION FOR RETURN ORDER ("UTSI's Mot.") and its MEMORANDUM OF POINTS AND

AUTHORITIES IN SUPPORT OF MOTION FOR RETURN ORDER ("UTSI's Mem."), Defendants' Starent Networks Corp., et al. (Collectively "STARENT") MEMORANDUM IN OPPOSITION TO PLAINTIFF UTSTARCOM'S MOTION FOR RETURN ORDER ("STARENT's Opp."), UTSI's REPLY IN SUPPORT OF ITS MOTION FOR RETURN ORDER ("UTSI's Reply"), STARENT's SUR–REPLY IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF UTSTARCOM'S MOTION FOR RETURN ORDER ("STARENT's Sur–Reply"), and UTSI's RESPONSE TO STARENT'S SUR–REPLY ("UTSI's Resp. Sur–Reply"). The instant motion comes after several rounds of document production by the parties. UTSI now seeks an Order directing STARENT to (1) return fifteen specific documents that UTSI alleges contain UTSI trade secrets, and (2) submit an inventory of every document in its possession that contains a trade secret of UTSI or any of its predecessors-in-interest to UTSI and to the Court, and immediately return those documents to UTSI, For the reasons that follow, UTSI's motion is denied.

## I. BACKGROUND [1]

In Counts I and XX of its Fourth Amended Complaint, UTSI sues STARENT for misappropriation of trade secrets and conspiracy to misappropriate trade secrets. (UTSI's First Am. Compl. ¶¶ 201, 211–30, 420–21.) Among other things,

Counts I and XX allege that, around the time of UTSI's acquisition of 3Com a/k/a CommWorks (formerly U.S. Robotics), Defendants Brian Espy, Todd Kelly, Mark Zarich, and others, took 3Com/U.S, Robotics/UTSI trade secrets with them when they quit their jobs and went to work for STARENT. In connection with these claims, both STARENT and UTSI have produced thousands of documents to one another.

On February 18, 2009, UTSI filed the instant motion, alleging that numerous documents produced by STARENT to UTSI contain 3Com/U.S. Robotics/UTSI trade secrets and should be returned to UTSI immediately. UTSI identifies fifteen documents by Bates number and submits the DECLARATION OF CHANDRA WARRIER IN SUPPORT OF PLAINTIFF UTSTARCOM, INC.'S MOTION FOR RETURN OF TRADE SECRETS DOCUMENTS ("Warrier Decl.") and the DECLARATION OF CHRISTOPHER L. RUDD IN SUPPORT OF PLAINTIFF UTSTARCOM INC.'S MOTION FOR RETURN OF TRADE SECRET DOCUMENTS ("Rudd Decl.") to demonstrate why those documents should be returned.[2] The Warrier Declaration focuses on the following nine documents identified in UTSI's motion (hereinafter the "Warrier Documents"):

> (1) Bates No. Starent–III–1230227–1230240 entitled, "Creating the independent, managed wireless data network"

---

1. In addition to the parties' briefs supporting and objecting to UTSI's Motion, in this Order, we cite to UTSI'S FIRST AMENDED COMPLAINT ("UTSI's First Am. Compl.").

2. UTSI initially identified sixteen document by Bates number. In footnote 3 of its Reply Brief, filed April 21, 2009, UTSI withdrew its request for the return of Exhibit K to the Warrier Declaration, Bates no. STARENT–III–0626176–0626297. Though Warrier declared that Exhibit K was a highly confiden-

tial CSBU trade secret, (*Id.*), STARENT presented evidence that this document was published by UTSI on UTSI's website. (Johnson Decl. ¶¶ 2–5, Ex. LJ–1.) In his March 12, 2009 deposition, Warrier admitted that, if Exhibit K had been published online, such an action would destroy any claim to trade secrets. (STARENT's Opp., Ex. 12, Warrier Dep. p. 134.) UTSI apparently agreed and therefore properly withdrew its request.

("Exhibit B"); (2) Bates No. Starent–III–0732691–0732700 entitled, "Customer Requirements Document For VPN tunnel initiation based on VLAN tags" (Exhibit C); (3) Bates No. Starent–III–0135697–0136622 entitled, "CommWorks Professional Services Worldwide Pricing Guidelines Version 1.0" ("Exhibit D"); (4) Bates No. Starent–III–0747525–0747544 entitled, "3G (cdma2000) Competitive Analysis" ("Exhibit E"); (5) Bates No. Starent–III–1779362–1779381 entitled, "Layer Two Tunneling Protocol *Design Specification*" ("Exhibit F"); (6) Bates No. Starent–III–0636505–0636529 entitled, "CommWorks Systems and Solutions, 3G Packet Data Wireless Access System Overview" ("Exhibit G"); (7) Bates No. Starent–III–0959441–0959459 entitled, "Wireless Data Network Market Evolution" ("Exhibit H"); (8) Bates No. Starent–III–0141288–0141290, entitled "Verizon Wireless" ("Exhibit I"); and (9) Bates No. Starent–III–1235143–1235180, entitled "Pipeline Opportunity Report Wireless, Americas" ("Exhibit J").

(UTSI's Mem. at pp. 4–5; Warrier Decl. ¶¶ 12–20, Exs. B–J), The Rudd Declaration, submitted by one of UTSI's attorneys in this matter, focuses on the following six documents identified in UTSI's motion (hereinafter the "Rudd Documents"):

(1) Bates No. Starent–III–0134690–0134695 entitled, "White Paper Understanding Essential Performance Characteristics of a Wireless Data Core Network" ("Exhibit 1A"); (2) Bates No. Starent–III–1235142, which is an e-mail from Defendant Brian Espy dated January 1, 2003 ("Exhibit 2"); (3) Bates No. Starent–III–1235127–1235131, which includes an e-mail chain, dated January 1, 2003, from Brian Espy and attaches a 3Com document entitled, "BellSouth International PDSN Project Matrix (Draft)" ("Exhibit 3"); (4) Bates No. Starent–III–1322331–1322347, which is an e-mail dated April 15, 2004 from Defendant Noel Charath, and an attached document entitled "3com_pdsn_hdg1.2_srd.doc" ("Exhibit 4"); (5) Bates No. Starent–III–1308070–1308085, which includes an e-mail chain, dated November 1, 2003, from Defendant Todd Kelly, and an attached document entitled, "VeriSign Proposal Final.zip" ("Exhibit 5"); and (6) Bates No. Starent–III–0136597–0136622 entitled, "CommWorks Professional Services Worldwide Pricing Guidelines Version 1.0" ("Exhibit 6").

(UTSI's Mem. at p. 5; Rudd Decl., ¶¶ 2–7, Exs. 1A–6.) In addition to the Warrier and Rudd Documents, UTSI alleges that STARENT is in possession of numerous documents containing UTSI trade secrets that must be returned, but does not identify any of them by name or Bates number. (UTSI's Mot. at pp. 3–4.) For the most part, all of the Warrier and Rudd Documents relate to 3Com's Carrier Systems Business Unit ("CSBU") technology, sales or pricing.

## A. UTSI's Evidentiary Support For Its Motion

In support of its motion, UTSI submitted Chandra Warner's Declaration, the Rudd Declaration and EXPERT WITNESS REPORT #1 OF DR. CHARLES P. PFLEEGER IN SUPPORT OF PLAINTIFF'S MOTION FOR RETURN ORDER ("Pfleeger Report"). While the Warrier and Rudd Declarations describe specific documents UTSI believes contain trade secrets, the Pfleeger Report details mass transfers of potentially significant files from Defendant Kelly's and Defendant Zarich's 3Com computers to other computers or media.

### 1. Declaration of Chandra Warrier

In his declaration, Warrier describes working for U.S. Robotics, then 3Com,

then UTSI from 1995 to present. (Warrier Decl. ¶¶ 3–4.) From 1996–2002, Warrier was a software engineer and then Senior Software engineer within U.S. Robotics and 3Com's CSBU where he worked on the Packet Data Serving Node ("PDSN") and Home Agent ("HA") products. (*Id.* ¶¶ 5–6). Since 2002, Warrier has served as Principal Systems Architect for CSBU for 3Com and then UTSI. (*Id.* ¶ 7.) Warrier states that in this capacity he has worked with marketing, sales, and product management for product and feature definition and developed feature requirements and design requirements relating to PDSN and HA software/hardware. (*Id.*)

Warrier declared that, in his fourteen years with CSBU he became familiar with CSBU's efforts to maintain and protect its confidential and proprietary trade secret information. According to Warrier, these efforts included (a) requiring all employees to sign non-disclosure and non-solicitation agreements ("NDA"), (b) restricting employees' access to restricted confidential and proprietary trade secret information (e.g., providing electronic key cards and multiple layers of computer passwords), (c) providing all new employees with brochures describing its trade secret policies, (d) maintaining confidential its propriety trade secrets information and enforcing its rights in such information. (*Id.* ¶ 10.) Warrier states that he himself was required to sign an Employee Agreement that prohibits him from disclosing any confidential and proprietary trade secret information to any outside party, requires him upon resignation to return all CSBU materials in his possession, and requires him to disclose and assign to 3Com/UTSI all intellectual property he developed during or as a result of his employment with CSBU. (*Id.* ¶ 11.)

Relying on his own experience, as well as information and belief, Warrier declared that all of the Warrier Documents contain highly confidential CSBU trade secrets and were, at all relevant times, treated as highly confidential trade secrets. (*Id.* ¶¶ 12–21.)

### 2. Expert Report of Dr. Pfleeger

UTSI also submits a forensic expert report from Dr. Charles P. Pfleeger, an independent consultant in computer and information system security with an extensive background in computer security and Internet web hosting. (Pfleeger Report ¶ 71.) Pfleeger performed forensic analysis on computers that were reportedly used by Defendants Kelly and Zarich while they were employed at UTSI. According to Pfleeger, his investigation revealed that sometime between July 23, 2002 and November 2002, an archive of approximately 3,000 documents was created and downloaded off Kelly's computer. (*Id.* ¶ 46.) That archive allegedly included documents with names such as "CommWorks Price List 05–23–02.xls," "PDSN and HA Performance Final6–18–02.zip," and "Wireless 3G 2.0 Price List 03.11.02.xls." (*Id.* ¶ 43.) Pfleeger also reports that Zarich printed approximately 847 pages of files before surrendering his computer to 3Com in November 2002. (*Id.* ¶ 4.) Pfleeger claims that 232 of these pages included the designation "Proprietary" or "Confidential" and may also contain price quotes, customer contact lists and sales opportunities. (*Id.* ¶ 66.)

### 3. March 12, 2009 Deposition of Chandra Warrier

On March 12, 2009, STARENT deposed Warrier regarding the contents of his declaration. The March 12 deposition revealed that Warner's Declaration was based largely on his recollections and impressions of 3Com/UTSI policies and procedures, but not on specific investigation into 3Com/UTSI policies or the contents and treatment of the ten Warrier documents. For instance, Warrier testified

that (1) he believed that all CSBU employees are required to sign nondisclosure and non-solicitation agreements, but he did not know that for sure, did not remember receiving materials about such agreements from 3Com, and had not consulted with anyone at UTSI about their use of such agreements (STARENT's Opp., Ex. 12, Warrier Dep. at pp. 53–54, 60–61, 84); (2) he believed that all members of CSBU received training and materials regarding confidential or trade secret information, but he could not remember any specific presentations or training regarding treatment of trade secrets, nor did he consult with 3Com or UTSI about their practices and procedures (*Id.* at pp. 57, 60–61, 72–77); and (3) he believed that U.S. Robotics, 3Com and CSBU all used pass cards and passwords to restrict access to certain offices, computers and databases, but he did not know who decided which employees would have access to different areas and materials and under what conditions, and he never made any inquiries into the matter. (*Id.* at pp. 67–69.)

The deposition also revealed that Warrier had no personal knowledge of, and had not educated himself regarding, the individual histories or treatment of the Warrier Documents. Although he declared that all nine Warrier Documents contain CSBU trade secrets, were maintained as a trade secrets, and were never shared without first obtaining an NDA, as discussed in depth below, Warrier conceded during his deposition that he had not inquired into the specific measures taken to protect any of the documents, had not been told of the measures taken, and had not seen evidence of any NDAs specifically relating to the Warrier documents. (*Id.* at pp. 86–87, 92, 105, 139–40, 144, 149–54, 163–65, 171–72, 178–81, 191.)

## B. STARENT's Response and Subsequent Filings

On March 30, 2009, STARENT filed its Response in Opposition to UTSI's motion. In its response, STARENT argues that UTSI fails to demonstrate any trade secrets in the Warrier or Rudd Documents, that UTSI's request for an inventory of additional trade secret documents in STARENT's possession is vague, overly broad and unenforceable, and that STARENT is entitled to attorneys fees because UTSI's motion is baseless and improper. (STARENT's Opp. at pp. 9–11, 13–14.) Along with that response, STARENT filed the DECLARATION OF BRIAN ESPY IN SUPPORT OF STARENT NETWORKS, CORP.'S OPPOSITION TO PLAINTIFF UTSTARCOM'S MOTION FOR RETURN ORDER ("Espy Decl."), in which Espy describes his work on a proposal for partnership between 3Com and VeriSign, as well as 3Com's policies when it came to sharing pricing information with its customers, (Espy Decl. ¶¶ 4–6.) [3]

On April 21, 2009, UTSI filed a Reply in which it reiterated the sufficiency of Warrier's Declaration and Deposition testimony (though it withdrew its request for return of Exhibit K to the Warrier Declaration) and suggested that STARENT consult UTSI's Second Suppl. Resp. to STARENT's Interrogatory 20 and 21(a) for the definition of trade secrets in this case. (UTSI's Reply at p. 10.) In STARENT's Sur–Reply, filed April 15, 2009, and UTSI's Response to STARENT's Sur–Re-

---

**3.** STARENT also filed the DECLARATION OF LAURA K. JOHNSON IN SUPPORT OF DEFENDANT STARENT NETWORK CORP.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF UTSTARCOM'S MOTION FOR RETURN ORDER ("Johnson Decl."), which contains a copy of Exhibit K from the Warrier Declaration that Ms. Johnson retrieved from UTSI's website. (Johnson Decl., Ex. LJ–1.) See fn. 2 above.

ply, field April 29, 2009, the parties debate the appropriateness of the categories and definitions of trade secrets set out in the responses to Interrogatory 20 and 21.

## II. ANALYSIS

■ The parties disagree as to what legal standards apply to UTSI's motion. UTSI argues that its evidence proves that STARENT is in possession of documents containing trade secrets and that this Court has the power and discretion under equity jurisdiction to order the return of those, and any other trade secret documents. (UTSI's Mem. at pp. 5–6.) STARENT does not dispute that this Court has the power to force the return of trade secret documents, but argues that UTSI's motion is a kin to a preliminary judgment motion and should be treated as such. According to STARENT, UTSI fails to establish that the documents in question are trade secrets or that the elements necessary for a preliminary injunction have been met. (STARENT's Opp. at pp. 8–9.) The Court agrees with STARENT.

UTSI and STARENT are in the midst of litigation and slowly proceeding towards a resolution of their dispute on the merits, as such, the Court is loath to alter the status quo of this case by designating documents as trade secrets or ordering the immediate return of documents without the benefit of substantial evidence and the showing of a pressing need.

■ The preliminary injunction analysis protects against unnecessary changes to the status quo in a way that UTSI's simple "equity" argument does not. Indeed, while this Court may have the power to issue rulings based on equitable considerations alone, "[e]quity jurisdiction exists only to remedy legal wrongs; without some showing of a probable right there is no basis for invoking it." *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir.1984). Although UTSI argues that STARENT's mere possession of a wrongly obtained UTSI trade secret creates such a right, the cases cited in UTSI's motion suggest otherwise.[4] Indeed, those courts ordered the return of documents and things only after granting a preliminary injunction or conducting a full hearing or trial. *See, e.g., Picker Int'l Corp. v. Imaging Equip., Servs., Inc.,* 931 F.Supp. 18, 22 (D.Mass.1995) (relief granted following a non-jury trial lasting several weeks); *Picker Int'l, Inc. v. Blanton,* 756 F.Supp. 971, 983 (N.D.Tex.1990) (preliminary injunction granted); *Institutional Mgm't Corp. v. Translation Sys., Inc.,* 456 F.Supp. 661, 671 (D.Md.1978) (writ of replevin granted and injunction issued where court found no party other than former employer had a proprietary interest in materials, equipment and documents taken from premises); *Curtiss–Wright Corp. v. Edel–Brown Tool & Die Co., Inc.,* 381 Mass. 1, 407 N.E.2d 319, 325 (1980) (relief granted following jury trial).

In the absence of a hearing on the merits or a fully briefed Rule 56 motion, the Court is not inclined to simply make findings of fact and order the return of documents that might contain trade secrets. Rather, we will apply the preliminary injunction analysis and weight the equities of this dispute in that context.

---

**4.** The Court is little moved by UTSI's reliance on *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211 (7th Cir.1979), to establish our jurisdiction in equity with regard to the instant motion. Thirty years ago, the *Commodity Futures* Court held that, in the absence of statutory language to the contrary, a district court could compel a violator of regulations promulgated under the trading limit provisions of the Commodity Exchange Act to disgorge his illegally obtained profits. *Id.* at 1223. This Court is not persuaded to ignore the safeguards factored into the preliminary injunction analysis on the basis of that holding.

## A. Preliminary Injunction Analysis

■ A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dept. of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir.2005). When determining whether to use such a remedy, "the district [court] has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Faheem–El v. Klincar*, 841 F.2d 712, 716 (7th Cir. 1988). The elements necessary to the issuance of a preliminary injunction in this case include: (1) UTSI has no adequate remedy at law; (2) UTSI will suffer irreparable harm if the preliminary injunction is not issued; (3) the irreparable harm UTSI will suffer is greater than the irreparable harm STARENT will suffer if the injunction is granted; (4) UTSI has a reasonable likelihood of prevailing on the merits; and (5) the injunction will not harm the public interest. *Roland Mach. Co.*, 749 F.2d at 382–83. These elements are evaluated on a sliding scale; the more likely UTSI is to win on the merits, the less heavily need the balance of harms weigh in its favor. *Id.* at 387.

### 1. Inadequate Remedy at Law & Irreparable Harm

■ There is a rebuttable presumption of irreparable harm to a plaintiff in cases of trade secret misappropriation and copyright infringement. *Atari Inc. v. N. Am. Philips Consumer Elec. Corp.*, 672 F.2d 607, 620 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). A defendant can rebut this presumption by demonstrating that the plaintiff will not suffer any harm if the injunction is not granted. *QSRSoft, Inc. v. Rest. Tech., Inc.*, No. 06 C 2734, 2006 WL 2990432, at *11 (N.D.Ill. Oct. 19, 2006), citing *Wainwright Secs., Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977).

■ The instant motion was apparently filed out of a sense of unfairness by UTSI, but does not appear to raise an urgent matter, as neither party suggests that it will suffer irreparable harm if UTSI's motion is granted or denied. As far as the Court can tell, STARENT has been in possession of the Warrier and Rudd identified Documents for several years, the parties have been entangled in litigation for over a year, and there is no evidence of any recent material changes relating to the documents or their use in the marketplace. (STARENT's Opp. at p. 2; UTSI's Reply. at pp. 1, 7.) Furthermore, the central issue to this motion—whether STARENT is in possession of UTSI trade secrets—overlaps significantly with Counts I and XX of UTSI's Complaint against STARENT, (UTSI's Fourth Am. Compl. ¶¶ 201, 211–30, 420–21), and resolution of the issue at a later date, following additional discovery and a deeper understanding of the legal and technical issues involved in the case, ought to produce an adequate remedy at law. It follows that these elements weigh entirely in favor of STARENT and not in granting UTSI's motion.

### 2. Likelihood of Success on the Merits: Illinois Trade Secret Act

■ To determine the likelihood of success on the merits in this case, the Court must consider the elements of the Illinois Trade Secret Act ("ITSA"). Under the ITSA, the Court may issue an injunction if there is "actual or threatened misappropriation of a trade secret." 765 ILCS 1065/3 (a). To prevail under the ITSA, UTSI must establish that (1) there is a trade secret, (2) the trade secret was misappropriated by STARENT, and (3) STARENT used the trade secret for business purposes. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir.1992) (citing 765 ILCS 1065/2).

### a. Likelihood of Success: Trade Secrets

■ The ITSA defines a trade secret as:

Information including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). In determining whether a trade secret exists, Illinois courts generally look to: (1) the extent that the information is known outside of the business; (2) the extent that the information is known to employees and others within the business; (3) the measures taken to protect the information from outsiders; (4) the value of the information to competitors; (5) the amount of time, money, and effort to develop the information; and (6) the ease that the information could be acquired by others. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir.2003). Whether efforts to maintain confidentiality were sufficient is not a question that can be decided as a matter of law on factual allegations alone. *Bagley v. Lumbermens Mut. Cas. Co.*, 100 F.Supp.2d 879, 884 (N.D.Ill.2000). Rather, the answer depends on a balancing of costs and benefits that will vary from case to case. *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179–80 (7th Cir.1991) (rejecting deciding whether efforts to protect a trade secret were sufficient on *summary judgment* in all but "extreme cases").

### i. Standing alone, Warrier's Declaration is too weak to justify making any findings of fact.

■ UTSI relies almost exclusively on Warrier's declaration and deposition testimony to *prove* that the Warrier Documents contain trade secrets and were treated as trade secrets, (UTSI's Mem. at p. 6.) Though Warrier is certainly familiar with CSBU technology and how things work generally at 3Com/UTSI, as noted above (and further revealed below), Warrier's statements regarding STARENT's obligations to comply with non-disclosure agreements and the specific measures taken to protect the Warrier documents from third parties are not based on a specific examination of, or inquiry into, the documents or defendants at issue in this motion. Though we recognize that admissibility standards for affidavits may be lower at the preliminary injunction stage, *see Goodman,* 430 F.3d at 439, in light of Warner's lack of inquiry into or first-hand knowledge regarding the Warrier Documents, the Court is reluctant to rely exclusively on his declaration to make findings of fact regarding trade secrets. *See, e.g., Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.,* 940 F.Supp. 1300, 1306 (N.D.Ill.1996) (noting that at summary judgment, non-expert witness may provide opinion testimony when such opinion testimony is grounded in witness's personal knowledge).

### ii. The Warrier Documents

Having voiced some of our concerns regarding the foundations of Warner's Declaration and UTSI's attempt to prove elements of Counts I and XX of its Complaint at this juncture, the Court reviews the Warrier Documents and UTSI's evidence for indications of trade secrets. As an initial matter, the Court notes that, for the most part, UTSI fails to address (1) the

extent that the alleged trade secrets contained in the Warrier Documents are known outside of UTSI, (2) the amount of time, money and effort it took to develop the alleged trade secrets, or (3) the ease with which the alleged trade secret information could be acquired by others. These are important questions to the trade secret analysis so the Court is immediately skeptical of UTSI's ability to carry its burden. *See Learning Curve Toys*, 342 F.3d at 722. Nonetheless, we examine each document in turn:

■ **Exhibit D** is entitled, "Comm-Works Professional Services Worldwide Pricing Guidelines Version 1.0," and was to become effective July 8, 2002. (Warrier Decl. Ex. D.) This document contains descriptions and price lists for various 3Com services, such as delivery, installation, training and testing services, as well as warranties offered by 3Com. (Warrier Decl. ¶ 14, Ex. D.) Warrier declares Exhibit D "was a CSBU trade secret [and] contains highly confidential and proprietary CSBU pricing information" and would not be shared with potential customers without first obtaining an NDA. (*Id.* ¶ 14.) STARENT argues this list was never a trade secret and never the subject of NDAs. In support of this claim, STARENT submits the Espy Declaration, in which Espy states that "[he] and others in sales were permitted to share [list prices] with [3Com] customers" and "did not regard the list prices as having much value because they did not reflect the actual prices paid by the customers, and the actual prices varied from customer to customer" due to discounts. (Espy Decl. ¶ 6.)

Absent a showing to the contrary, Illinois courts tend to treat price lists as non-trade secrets, as customers often share that information with one another. *See Del Monte*, 616 F.Supp.2d at 819–20 (N.D.Ill.2009); *Applied Indus. Materials Corp. v. Brantjes*, 891 F.Supp. 432, 438

(N.D.Ill.1994). Thus, the touchstone of this inquiry focuses on secrecy of such information. *MJ & Partners Rest. Ld., P'ship v. Zadikoff*, 10 F.Supp.2d 922, 933 (N.D.Ill.1998). Though he declares the document a trade secret, at his deposition Warrier conceded that he was not familiar with the content of Exhibit D and based his trade secret determination on conversations with unidentified managers over the years who conveyed to him that price lists in general are proprietary information. (STARENT's Opp., Ex, 12, Warrier Dep. at pp. 178–81.) Warrier assumes this price list would not be shared with clients unless an NDA had been executed, (Warrier Dep. pp. 180–81), but neither he nor UTSI present any evidence that such an NDA exists, and the Court will not simply assume that happened. On this record, UTSI cannot persuade the Court to discount Espy's Declaration or designate Exhibit D a past or present trade secret.

■ **EXHIBIT I**, entitled "Verizon Wireless," is a Verizon employee depth chart, which, for the most part, appears to include the CFO, CIO, vice presidents and regional directors in the Verizon system. (Warrier Decl., Ex. I.) Exhibit I was not marked confidential by UTSI, but Warrier claims this depth chart was a CSBU trade secret because it contains highly confidential and proprietary CSBU customer information. (*Id.* ¶ 19.) STARENT disagrees and claims that the chart contains information about Verizon employees only and cannot be kept secret by UTSI. STARENT also claims Exhibit I was never treated as a trade secret.

Whether customer lists are trade secrets depends on the facts of each case. Where the list was developed slowly and through hard work, stored in a secure location, and shared with employees on a need-to-know basis and only after they signed confidentiality agreements, the list may qualify as

a trade secret. *See Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F.Supp.2d 805, 820–21 (N.D.Ill. 2009); *Liebert Corp. v. Mazur*, 357 Ill. App.3d 265, 293 Ill.Dec. 28, 827 N.E.2d 909, 922–23 (Ill.App.Ct.2005). In his deposition, Warrier claimed that 3Com developed Exhibit 1 over time by speaking to potential customers and contacts at Verizon, but he did not know that for sure. (STARENT's Opp., Ex. 12, Warrier Dep. pp. 139–40, 144). Furthermore, Warrier did not know whether Exhibit I was actually considered a secret by 3Com or Verizon, or if any steps were taken to keep it confidential, nor had he made inquiries into the matter. (*Id.* at pp. 139, 144–45.) This evidence fails to demonstrate that Exhibit 1 took time and effort to develop or that it was stored in a secure location and treated like a trade secret. For these reasons, the Court will not designate Exhibit I a trade secret at this time.

■ **EXHIBIT J,** entitled "Pipeline Opportunity Report Wireless, Americas," and dated November 15, 2002, contains 2002–2003 3Com revenue projections for various wireless accounts. (Warrier Decl. Ex. J.) Warrier declares Exhibit J to be a trade secret that was always maintained as such because it contains highly confidential and proprietary CSBU financial information. (*Id.* ¶ 20.) STARENT denies this claim and argues that revenue projections were never considered trade secrets or treated as trade secrets.

Revenue projections cannot be considered trade secrets unless there is ample evidence that they were treated as such. *Recycled Paper Greetings v. Davis*, 533 F.Supp.2d 798, 806 (N.D.Ill.2008). Though Warrier based his declaration on the assumption that 3Com's general policy was to keep all revenue projections secret and locked up, in his deposition, he concedes that he was never involved with revenue projections at 3Com, does not know for

sure whether 3Com treated revenue projections as trade secrets, and is not familiar with 3Com's treatment of Exhibit J. (STARENT's Opp., Ex. 12, Warrier Dep. at pp. 149–52.) In fact, Warrier does not recall whether he was told that revenue information is shared outside of the company and he never made inquiries into the matter. (*Id.* at p. 152.) On this evidence, it is impossible for the Court to determine whether Exhibit J was treated as a trade secret.

■ **Exhibit E,** entitled "3G (cdma2000) Competitive Analysis," is a December 2000 presentation that highlights the strengths and weaknesses of 3Com's products and offerings against the strengths and weaknesses of its competitors' products and offerings. (Warrier Decl. ¶ 15, Ex. E.) For example, the document spells out technical specifications of various products offered by competitors Nortel, Cisco and Ericcson and then offers suggestions to 3Com's sales force on differentiating 3Com products from the competition when making a sale. (*Id.*) Each page of the presentation has a footer that reads, "3Com Confidential." (*Id.*) Warrier declares this document was a CSBU trade secret because it contains highly confidential and proprietary CSBU marketing information." (*Id.* ¶ 15.) In his deposition he explains that all CSBU marketing documents are in a class of documents that would be maintained as trade secrets. (STARENT's Opp., Ex. 12, Warrier Dep. at p. 172.)

The ITSA precludes trade secret protection for information generally known or understood within an industry, even if not to the public at large. *QSRSoft, Inc.*, 2006 WL 2990432, at *6 citing *Pope v. Alberto-Culver Co.*, 296 Ill.App.3d 512, 230 Ill.Dec. 646, 694 N.E.2d 615, 617 (Ill.App.Ct.1998). Exhibit E appears to list the technical offerings of 3Com's competitors and con-

trasts them with known offerings from 3Com. It is unclear why specifications of 3Com's competition constitute a 3Com trade secret, as they are obviously known to outside parties and cannot be kept secret by UTSI. Though Warrier declares Exhibit E to be a CSBU trade secret, in his deposition, he would not identify any 3Com secrets in the document and simply repeated, "[Exhibit E] contains information that may or may not be publicly known, but as a whole this document contains trade secrets." (STARENT's Opp., Ex, 12, Warrier Dep. at p. 178.) Warrier did not testify to any personal knowledge regarding the history or treatment of Exhibit E, or whether he had been informed that all CSBU marketing materials were trade secrets. (*Id.* at pp. 171–72.) Taken as a whole, such conclusory and uninformative testimony does not help UTSI establish trade secrets, and as such Exhibit E will not be accorded that status.

■ **Exhibit H,** entitled "Wireless Data Network Market Evolution," is dated November 23, 2001, and contains marketing information regarding 3Com's share of the wireless market and highlights 3Com's international presence in the market. (Warrier Decl., Ex. H.) Warrier declared that Exhibit H contains confidential CSBU marketing information, was treated as a trade secret, and would only have been presented to a customer upon execution of an NDA. (*Id.* ¶ 18.) STARENT argues that the information contained in Exhibit H is not a trade secret, but mere market data available to the entire world.

The Court is not convinced that this market data represents 3Com/UTSI trade secrets. On its face, Exhibit H appears to contain industry-wide data, not analysis, strategy, or designs generated by 3Com/UTSI. As noted above, the ITSA precludes trade secret protection for information generally known or understood within an industry. *QSRSoft, Inc.,* 2006

WL 2990432, at *6. Furthermore, marketing materials, revenue figures and financial projections are not protected trade secrets unless UTSI provides evidence of actions taken to protect the documents. *Recycled Paper Greetings,* 533 F.Supp.2d at 806. UTSI offers no such evidence. During his deposition, Warrier refused to identify any item in Exhibit H that constituted a trade secret and simply declared that the document in its entirety is a trade secret. (STARENT's Opp., Ex. 12, Warrier Dep. at p. 164.) He admitted, however, that he was not familiar with the past treatment of Exhibit H and that nobody ever told him it was confidential. (*Id.* at pp. 163–65.) Though Warrier alluded to the need for an NDA before sharing Exhibit H with customers, UTSI fails to present evidence of such an NDA or any other evidence demonstrating actions taken to protect Exhibit H. Overall, this showing is insufficient to persuade the Court at this time to designate Exhibit H a trade secret,

■ **Exhibit G,** entitled "CommWorks Systems and Solutions, 3G Packet Data Wireless Access System Overview," describes features of 3Com's 3G Packet Data Wireless System, such as the Packet Data Serving Node and Home Agent. (Warrier Decl., Ex. G.) Exhibit G was apparently intended for distribution to third parties, as it contains disclaimers such as, "this document is for information purposes only and is subject to change without notice. 3Com makes no representations or warranties with respect to the contents hereof and specifically disclaims any implied warranties of merchantability or fitness for any particular purpose." (*Id.,* Ex. G at STARENT–III–0636506.) The document also explains, "We bring you numerous advantages through our wireless access solutions" and then describes "Our willingness to work with virtually any switch vendor ... An experienced, global Profes-

sional Services organization ... [that] can help you minimize risks ...." (*Id.,* Ex. G at STARENT–III–0636508.) According to Warrier, Exhibit G is a trade secret that contains highly confidential CSBU technology, describes features of 3Com technology, was used internally, and would only have been provided to a customer upon execution of an NDA." (*Id.* ¶ 17.)

The plain text of Exhibit G suggests it was intended for non–3Com consumption, and UTSI fails to present sufficient evidence that it was ever treated as a trade secret. Despite the strong language in his declaration, Warrier acknowledged that, prior to preparing his declaration, he had never seen Exhibit G, though he "may have seen documents from which information was gathered to create [Exhibit G]." (STARENT's Opp., Ex. 12, Warrier Dep. at p. 153.) Upon further questioning, it became clear that Warrier did not know for sure whether any 3Com groups or departments used Exhibit G internally, but thought the document looked like other documents he believed were kept internally. (*Id.* at p. 154.) Additionally, neither Warrier nor UTSI presented any evidence that NDAs were executed before Exhibit G was shared with customers, nor did they explain why it lacked any confidentiality designations. (*Id.* at pp. 156–57.) Again, the ITSA precludes trade secret protection for information generally known or understood within an industry and will not apply to marketing materials in the absence of reasonable steps taken to ensure secrecy. *See Recycled Paper Greetings,* 533 F.Supp.2d at 806; *QSRSoft, Inc.,* 2006 WL 2990432, at *6. UTSI has not demonstrated reasonable steps taken to ensure the secrecy of Exhibit G, and accordingly the Court will not treat it as such.

■ **Exhibit B,** entitled "Creating the independent, managed wireless data network," is a proposed partnership between 3Com and VeriSign, a potential 3Com cus-

tomer, to create scalable, manageable and affordable high-speed data and messaging services for the wireless telecommunications industry, (Warrier Decl., Ex. B.) The document spells out ways in which such a partnership would deliver value to VeriSign and second and third tier wireless users. (*Id.* ¶ 12, Ex. B.) The document does not contain any proprietary and confidential markings. In his declaration, Warrier claims that this document was a proposal to VeriSign and such documents would only have been provided to a customer upon execution an NDA. (*Id.* ¶ 12.) STARENT and Espy reject Warrier's claim and state that Exhibit B was a proposal to sell existing products to VeriSign and did not include any secret or confidential information, as it contained public information about both companies. (Espy Decl. ¶ 4.) According to Espy, he helped draft the agreement, but, to his knowledge, 3Com and VeriSign never entered into a partnership. (*Id.* ¶ 5.)

Despite declaring Exhibit B a trade secret, Warrier does not identify any specific trade secrets in the document, (STARENT's Opp., Ex. 12, Warrier Dep. at p. 95), and admits that he does not know whether VeriSign was ever a customer of 3Com's or ever actually signed an NDA relating to Exhibit B. (*Id.* at pp. 86–87,92.) Furthermore, Warrier never made inquiries into the contents or significance of the document, but just assumed an NDA would have been required based on his experience working with such technologies. (*Id.* at pp. 92–95.) Warrier's uninformed testimony combined with the lack of any evidence of an executed NDA undermine UTSI's claim, Espy's Declaration, on the other hand, offers first-hand knowledge that is consistent with the express language of Exhibit B, as well as the lack of proprietary and confidential indicators on the document. In light of the weak evidence presented by UTSI and the reason-

able explanations offered by STARENT, the Court is not prepared to designate Exhibit B a trade secret at this time.

■ **Exhibit F,** entitled "Layer Two Tunneling Protocol *Design Specification,*" describes the design of the Layer Two Tunneling Protocol ("L2TP") process and specifies its interface with the various components of the "Pilgrim" system. (Warrier Decl. ¶ 16, Ex. F.) The cover page, as well as every other page of the document contains a note designating the material as "3Com Confidential Proprietary." The document was apparently last revised in December 1997, (*Id.,* Ex. F at STARENT–III–1779363), and the references listed on page five of the document all cite to materials created in July, October and November 1997, (*Id.,* Ex. F at STARENT–III–1779366.)

Though Warrier declared that Exhibit F is a design document and was, at all times, a CSBU trade secret, (*Id.* ¶ 16), in his deposition, he conceded, "No one has specifically told me about this document, but all design documents are trade secrets." (STARENT's Opp., Ex. 12, Warrier Dep. at p. 191.) STARENT questions whether the designs included in Exhibit F were treated like trade secrets and presents evidence that, over the years, U.S. Robotics and 3Com shared L2TP Protocol with the Internet Engineering Task Force ("IETF"), a large open international community of network designers that develops and promotes Internet standards. (*Id.,* Exs. 16–17; *Id.,* Ex. 12, Warrier Dep. at p. 188.) Exhibit 16 to STARENT's Opp. is a 1996 U.S. Robotics document sent to IETF entitled, "Virtual Tunnel Protocol Layer 2 Protocol Extension," and clearly states, "Distribution of this memo is unlimited." (*Id.,* Ex. 16.) STARENT's Exhibit 17, a 2001 document addressing L2TF submitted by 3Com's Rohit Verma to IETF, contains identical language. (*Id.,* Ex. 17.) Significantly, IETF is referenced in one of

the final revisions to Exhibit F, and that those revisions were made by Rohit Verma. (Warrier Decl., Ex. F at STARENT–III–1779363.)

Unanswered questions as to the secrecy and value of Exhibit F prevent the Court from designating it a trade secret. The Court will not simply assign trade secret status to all "design" documents, nor assume they were all subjected to the same treatment. As noted above, Warrier does not have specific information regarding the manner in which UTSI protected the secrecy of Exhibit F within or outside the walls of U.S. Robotics/3Com/UTSI. (STARENT's Opp., Ex. 12, Warrier Dep. at p. 191.) Warrier also acknowledged that some members of the CSBU group may be involved in standards activities with the ITEF and that any designs submitted to the IETF would be available for public consumption and could not be trade secrets. (*Id.* at pp. 197–98). Nonetheless, and despite the references to IETF on the face of Exhibit F, Warrier made no inquiries to determine whether Exhibit F or the designs contained therein, had been submitted to IETF or were otherwise made public. (*Id.* at pp. 196–97.) Given Warner's lack of knowledge relating to Exhibit F, the Court is not now inclined to assign it trade secret status.

■ **Exhibit C,** entitled, "Customer Requirements Document For VPN tunnel initiation based on VLAN tags," describes "tunnel initiations based on VLAN tag that is required by SPCS" and states that the feature described is "specifically designed for SprintPCS, to help them provide the VPN [Virtual Private Network] solution ... for their mobile customers." (Warrier Decl., Ex. C at STARENT–III–07323693). Exhibit C appears to be a draft that contains comments and mark-ups from five rounds of revisions, the last of which were made on December 6, 2001. (*Id.,* Ex. C at

Bates No. Starent–III–0732692.) There is a footer on every page of Exhibit C that reads, "Proprietary and Confidential, CommWorks Corp, a 3Com Company." (*Id.*, Ex. C at STARENT–III–0732691– 0732700.)

According to Warrier, this document was prepared in response to a request for proposal by SprintPCS and was, at all relevant times, a CSBU trade secret because it contains confidential and proprietary CSBU technology. (*Id.* ¶ 13, Ex. C). Specifically, Warrier explained that the document "contain[s] high-level requirement from [SprintPCS] which are broken down into low-level requirements we author." (STARENT's Opp., Ex. 12, Warrier Dep. at p. 99.) Warrier also states that such information would be provided to SprintPCS only upon execution of an NDA. (Warrier Decl. ¶ 13, Ex. C.) STARENT argues that Exhibit C is not entitled to trade secret protection, as 3Com and Sprint were both contributing information to this work-in-progress so, with out more information, it is impossible to tell which pieces of information in the document came from 3Com and which came from Sprint. (STARENT's Opp. at p. 7.) Furthermore, STARENT claims that it is unclear whether this document represents a final draft, whether it resulted in an actual deal with Sprint, whether it contains anything of value to 3Com/UTSI or its competitors, whether it was shared with SprintPCS, or whether an NDA was ever executed. (*Id.* at pp. 7–8.)

As with Exhibit F, too many unanswered questions prevent the Court from designating Exhibit C a trade secret document at this time. Though the parties seem to agree that UTSI's low-level solutions to SprintPCS's high-level request may evidence trade secrets, (*Id.* at p. 7), the underling and strikethroughs in Exhibit C suggest that this document is not a finished product and may contain work

and contributions from SprintPCS, as well as 3Com/UTSI. (STARENT's Opp., Ex. 12, at p. 105.) If the document is a work-in-progress or an unsuccessful or terminated project, these draft solutions may lack any value to UTSI, Sprint, STARENT, or anyone else. UTSI does not address this issue, however, so the Court is somewhat in the dark. Questions of value and authorship aside, the specific security measures taken with regard to Exhibit C also remain a mystery. Though Warrier assumes an NDA was obtained from SprintPCS, in his deposition, he concedes that he has never seen an NDA relating to Exhibit C, and did not make inquiries into specific steps taken to protect the content of Exhibit C. (*Id.* at p. 105). Given the significant holes in UTSI's evidence, the Court will not designate Exhibit C a trade secret at this time.

### iii. Out-dated Warrier Documents

 Whether or not the Warrier Documents were treated as trade secrets, the Court cannot help but note that time is not on UTSI's side. Many of the Warrier Documents are quite old at this point and are therefore unlikely to hold any value for UTSI or STARENT. For example, Exhibits C and F deal with design technology from 2001 and 1997 respectively, Exhibit E contains a competitive analysis dating back to 2000, and Exhibits D, H and J contain pricing, marketing data and revenue projections from 2002, 2001 and 2000, respectively. (Warrier Decl., Exs. C–F, H, J.) To remain a trade secret documents must have actual or potential value. *See* 765 ILCS 1065/2(d). Given how quickly the high-tech world changes, and how stale and out-dated many of these documents have become, the Court will not assume that Exhibits C–F, H, and J remain valuable to UTSI, STARENT, or their competitors. *See Applied Indus. Materials Corp.*, 891 F.Supp. at 438 (finding that,

after five years, even confidential pricing and revenue data is "so outdated that it lacks current economic value."). Significantly, UTSI does not present the Court with evidence suggesting these documents still retain value, Thus, for "staleness" reasons alone, the Court would deny UTSI's request to designate these documents trade secrets.

In a similar vein, there is a strong chance that any precautions U.S. Robotics, 3Com, or UTSI might have taken to protect the Warrier Documents have expired by now. Though UTSI presents no NDAs relating to the Warrier or Rudd Documents, STARENT points out that several other 3Com/UTSI NDAs executed in 2003 and 2004 contain protection periods that bind the parties to secrecy for one, two, or three years. (STARENT's Opp., Exs. 18–20, at UTS2582–B296308, UTS2582–B294427, UTS2582–B297114.) Given that the Warrier and Rudd Documents all predate 2004, even the most restrictive of these NDAs would have expired by now. This further demonstrates how quickly technical documents may become out-dated and how unlikely it is that the Warrier Documents retain any value.

For all of the discussed above, the Court refuses to designate any of the Warrier Documents as trade secrets at this time.

#### iv. The Rudd Documents

▮ Attorney Rudd presents the Court with six documents that he believes contain trade secrets and establish misappropriation of trade secrets by STARENT. (Rudd Decl., Exs. 1A–7.) Due to the parties' protective order, Rudd was not permitted to share some of these documents with UTSI. (*Id.* ¶¶ 4–5.) The Court reviews the Rudd Documents, but fails to find sufficient evidence of trade secrets.

**Exhibit 1A,** entitled, "White Paper Understanding Essential Performance Characteristics of a Wireless Data Core Network," is dated May 29, 2002 and describes some of the Call Events Performance Testing 3Com conducted for its PDSN technology. (UTSI Mot. Return, Rudd Decl. ¶ 2 Ex. 1A.) STARENT originally designated this document confidential but agreed when asked to remove its confidentiality designations from the document (UTSI's Mem. at p. 5, fn. 7.) UTSI has since designated the document "Highly Confidential." (Rudd Decl. ¶ 2.) Following STARENT's removal of the confidential label, UTSI presumably had full access to Exhibit 1A and could have presented evidence as to why it is a trade secret. No such evidence is currently before the Court so we cannot know whether Exhibit 1A is a trade secret or was treated as a trade secret.

**Exhibit 2,** contains an email from Defendant Brian Espy dated January 1, 2003, and an attachment entitled, "PipelineOpp Wireless 11–15–02.ppt," which UTSI claims is Exhibit J from the Warner Documents above. (Rudd Decl. ¶ 3, Ex. 2.) In the email, Espy comments that "I used to be able to get all contacts in Siebel but they fixed the system" and "Please do not distribute the attached presentation. I'd feel a lot more comfortable if we kept it between us." (Rudd Decl., Ex, 2 at STARENT–III–1235142.)

There are no trade secrets contained in the text of this email and, as noted above, UTSI has yet to establish that Exhibit J contains trade secrets. It follows that Exhibit 2 is not a trade secret and STARENT will not be required to return it to UTSI.

**Exhibit 3,** includes an email chain, dated January 1, 2003, and attaches a 3Com document entitled, "BellSouth International PDSN Project Matrix (Draft)." (Rudd Decl. ¶ 4, Ex. 3.) The attached document lists eleven countries in Central and South America and provides data and figures regarding (1) Total cellular customers, (2)

Initial revenue, (3) Initial PPP, (4) Development requirements, and more. The document lacks proprietary and confidential markings and appears to reflect market conditions in late–2002. (*Id.*, Ex. 3 at Starent–III–1235129–1235131.) In his declaration, Rudd states, "Starent designated this document as "Highly Confidential," [so] I was unable to show this document to anyone at UTStarcom." (*Id.* ¶ 4.)

Given the age of this document and what appears to be generic market data, the Court is skeptical that Exhibit 3 contains trade secrets. That said, UTSI apparently believes this document contains trade secrets and, if moved to do so, the Court will consider reducing Exhibit 3's "Highly Confidential" designation in order that UTSI might review the document and present any evidence it has of trade secrets.

**Exhibit 4** contains an e-mail dated April 15, 2004 from Defendant Noel Charath and an attached document entitled "3com_pdsn_hdg1.2_srd.doc, Functional Specification For TTI Netrac." (Rudd Decl. ¶ 5, Ex. 4.) The purpose of the attached document is to describe the requirements for the implementation of TTI Netrac for 3Com PDSN HDG1.2. (*Id.*, Ex. 4 at STARENT–III–1322337). The document goes on to spell out architecture requirements, data descriptions, report requirements, and more. (*Id.*, Ex. 4.) Rudd believes that Exhibit 4 contains UTSI trade secrets, but he has been unable to share the document with UTSI because STARENT marked it "confidential." (*Id.* ¶ 5.) If moved to do so, the Court will consider reducing Exhibit 4's confidentiality designation so that UTSI may review it for trade secrets.

**Exhibit 5** includes an email chain, dated November 1, 2003, from Defendant Todd Kelly and an attached document entitled, "VeriSign Proposal Final.zip." (*Id.* ¶ 6, Ex. 5.) The attached document is Exhibit B of the Warrier Documents above. In the November 1, 2003 email, Kelly acknowledges that Exhibit B is "a copy of the proposal we worked on in our past like that you asked for." (*Id.*, Ex. 5 at STARENT–111–1308070.)

As noted above, the Court refuses to designate Exhibit B a trade secret and UTSI does not present any argument or additional evidence as to why STARENT must return Exhibit 5. The November 1, 2003 email chain and the attached Exhibit B may prove to be an important part of UTSI's case in the future, but for purposes of this motion, neither document constitutes a trade secret or compels the entering of a return order.

**Exhibit 6,** entitled "CommWorks Professional Services Worldwide Pricing Guidelines Version 1.0," is identical to Exhibit D of the Warrier Documents. Exhibit 6 was allegedly recovered by UTSI from the documents Defendant Kelly "WinZiped" upon his resignation from UTSI. (*Id.* ¶ 7, Ex. 6.) As noted above, UTSI fails to present sufficient evidence to establish Exhibit D/Exhibit 6 contains trade secrets, so the Court will not order its return.

For these reasons, the Court will not designate any of the Rudd Documents as trade secrets at this time.

**b. Likelihood of Success Under ITSA: Misappropriation**

 To demonstrate a likelihood of success under ITSA, UTSI must also present evidence of misappropriation. The ITSA defines misappropriation as:

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (1) derived from or through a person who utilized improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS 1065/2(b). UTSI presents forensic evidence and emails to demonstrate misappropriation. The forensic evidence suggests large quantities of documents may have been removed by Defendants shortly before they left UTSI for STARENT, including documents with names that suggest potentially sensitive materials relating to PDSN and HA technologies. (Pfleeger Report ¶¶ 43, 46.) UTSI also presents evidence of large quantities of confidential UTSI documents being printed by Defendant Zarich in the days before he left UTSI. (*Id.* ¶ 4.) Finally, UTSI submits emails in the Rudd Documents that may reveal direct links between specific UTSI documents and potentially inappropriate transfers of sensitive information to STARENT. (Rudd Decl., Exs. 3–5.)

Despite what appears to be a massive transfer of documents from UTSI to STARENT, only two of the documents now before the Court—Exhibits B and D of the Warner Documents—have been connected to the allegedly improper document transfers. (Rudd Decl. ¶¶ 5–6.) Unfortunately for UTSI, the Court does not designate either Exhibit B or D, or any other Warrier or Rudd Document, as a trade secret at this time. Given that misappropriation requires an improper acquisition, disclosure or use of "trade secrets," no matter how suspicious or unusual STARENT's behavior, UTSI cannot establish misappropriation in this motion. Additional discovery may reveal that STARENT is in possession of trade secret documents that were inappropriately transferred out of UTSI's possession, but those findings will have to wait until later in this case.

### c. Likelihood of Success Under ITSA: Used in business

 Finally, to demonstrate a likelihood of success under the ITSA, UTSI must show how STARENT put the alleged UTSI trade secrets to use. 765 ILCS 1065/2; *Composite Marine Propellers*, 962 F.2d at 1265–66. UTSI presents no such evidence, as its motion focuses exclusively on the unfairness of STARENT possessing its alleged trade secret documents. The Court is confident that UTSI will argue this point vigorously as this case proceeds towards resolution on the merits, but for now UTSI's failure to present evidence regarding STARENT's utilization of the alleged trade secrets makes it that much easier for the Court to determine that UTSI fails to carry its burden with regard to likelihood of success. This is especially true of those documents that UTSI concedes are not "current" trade secrets, such as old price lists and revenue projections. (UTSI's Reply at p. 7.) Without some evidence that these non-current trade secrets were ever used by STARENT, the Court is all the more reluctant to deem them trade secrets at this time.

For the reasons discussed above, UTSI fails to demonstrate any likelihood of success on the merits of its misappropriation of trade secrets claim. As UTSI failed to demonstrate an inadequate remedy at law or irreparable harm, all of the equities weigh in favor of denying UTSI's Motion for Return Order.

## B. UTSI's Request for Inventory of All Trade Secrets

 UTSI also moves the Court to order STARENT to submit an inventory of "those trade secret documents that, on their face, are trade secrets of [UTSI or 3Com]" and "promptly return those documents to [UTSI]." (UTSI's Reply at p. 10.) UTSI suggests that STARENT consult UTSI's Second Suppl. Resp. to STARENT's Interrogatory No. 20 and 21(a) (served on April 15, 2009) if STARENT needs assistance determining whether a document contains trade secrets. (*Id.*) STARENT argues that it has already produced all documents it deemed to be UTSI trade secrets. STARENT also takes issue with the manner in which UTSI defines trade secrets in its Second Suppl. Resp. to STARENT's interrogatory No. 20 and 21(a) and contends the requested relief is too vague and is unenforceable. (STARENT's Sur–Reply at pp. 1–2.)

UTSI's requested relief is determine, indeed, to be vague and unenforceable. UTSI's Second Suppl. Resp. to STARENT's Interrogatory No. 20 and 21(a) identifies twenty-one different categories of trade secrets, including, technical categories like "The Control Node Function," "The Enhancements to Standards," and "The Internet Protocol ("IP") Address Management" as well as more general business categories like "The Pricing (list, consumer discounts)," "The Consumer Contacts," "The Request For Proposal ("RFP") Responses," and "The Sales Plans and Projections" categories. (*Id.*, Ex. SR1 at pp. 3–9.) As discussed above, determination of trade secrets requires a document-by-document analysis that takes into consideration the content of the materials in question, how they were treated or protected, whether they are valuable, how much effort went into their creation, and more. *See* 765 ILCS 1065/2(d); *Learning Curve Toys*, 342 F.3d at 722, It is simply

not enough for a plaintiff to "point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers*, 962 F.2d at 1266. *See also Thermodyne Food Serv. Prods.*, 940 F.Supp. at 1305, n. 4. Whether documents now in STARENT's possession fall into the categories set out in UTSI's Second Suppl. Resp. to Interrogatory No. 20 and 21(a) will involve numerous subjective decisions regarding the content of the documents, the weight of the evidence demonstrating trade secret, and more. Ordering STARENT to engage in such a review in a vacuum, and then ordering the itemization and return of any documents STARENT may deem relevant, will prove unenforceable by the Court and unsatisfactory to all the parties involved. It follows that the Court will not order STARENT to return any documents that have not been specifically identified in this order.

## C. Special Treatment of Documents Discussed in this Motion

The Court takes this opportunity to reiterate that, just because the Warrier and Rudd Documents are not found to be trade secrets today, does not mean they are not trade secrets. To be safe, the Court orders STARENT to treat the Warrier and Rudd Documents as though they had been produced to STARENT by UTSI with their current, UTSI-assigned designations of confidentiality. This means, going forward, STARENT must restrict use of or exposure to those documents, in accordance with the parties' protective order. Individuals who, in the past, had access to any of the Documents may retain that access but will, however, be bound to follow the terms of the protective order with respect to such Documents.

## D. Attorneys Fees

 STARENT argues that it is entitled to its reasonable attorney fees because UTSI's motion was baseless and improper. (STARENT's Opp. at p. 14.) This Court has authority to sanction a litigant for bad faith conduct under the inherent powers of the court. *Diettrich v. Nw. Airlines, Inc.,* 168 F.3d 961, 964 (7th Cir.1999). An exercise of such powers, however, must be applied with caution. *Rosenthal Collins Group, LLC v. Trading Tech. Int'l, Inc.,* No. 05 C 4088, 2007 WL 844610, at *2 (N.D.Ill. March 14, 2007). In order to impose such sanctions we must find that UTSI displayed willfulness, bad faith or fault. *Id.* at *3, citing *In re Thomas Consol. Indus., Inc.,* 456 F.3d 719, 724 (7th Cir.2006). The burden to show such bad faith by clear and convincing evidence lies with the moving party. *Id.*

The Court will not award STARENT attorneys fees or costs. Though we deny UTSI's Motion for Return Order, there has been no showing by STARENT that UTSI pursued this motion in bad faith, to prolong these proceedings, or otherwise harass or inconvenience STARENT. Furthermore, given the sensitivity of some of the documents at issue, UTSI could reasonably have believed that it needed to file the instant motion in order to protect against potential harm to its proprietary rights in its alleged trade secrets. It follows that STARENT's request for fees is denied,

## III. ORDER

For the reasons set forth above, it is hereby ordered that:

(1) The following documents are not designated trade secrets at this time, and UTSI's request that STARENT be ordered to return them is denied:
Bates Nos. Starent–III–1230227–1230240; Starent–III–0732691–0732700; Starent–III–0135697–0136622; Starent–III–0747525–0747544; Starent–III–1779362–1779381; Starent–III–0636505–0636529; Starent–III–0959441–0959459; Starent–III–0141288–0141290; Starent–III–1235143–1235180; Starent–III–0134690–0134695; Starent–III–1235142; Starent–III–1235127–1235131; Starent–III–1322331–1322347; Starent–III–1308070–1308085; and Starent–III–0136597–0136622.

(2) If moved to do so, the Court will consider altering the confidential designation of Bates No. Starent–III–1235127–1235131 and Starent–III1322331–1322347 of the Rudd Documents so that UTSI may review them for trade secrets.

(3) UTSI's request that STARENT be ordered to submit an inventory of every document in its possession that contains a trade secret of UTSI or any of its predecessors-in-interest to UTSI and to the Court, and immediately return those documents to UTSI is denied.

(4) STARENT shall prospectively, as described herein, treat the following documents as though they had been produced to STARENT by UTSI with their current confidentiality designations (as assigned by UTSI), and comply with the terms of the parties' Protective Order accordingly:
Bates Nos. Starent–III–1230227–1230240; Starent–III–0732691–0732700; Starent–III–0135697–0136622; Starent–III–0747525–0747544; Staren–III–1779362–1779381; Starent–III–0636505–0636529; Starent–III–0959441–0959459; Starent–III–0141288–0141290; Starent–III–1235143–1235180; Starent–lII–0134690–0134695; Starent–III–1235142; Starent–III–1235127–1235131; Starent–III–1322331–1322347; Starent–III–1308070–1308085; and Starent–III–0136597–0136622.

(5) STARENT's request for costs and attorneys fees is denied.